UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| VALVE CORPORATION,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>JENNEEN ALSHALALDEH, DYLAN BARTELL, LINCOLN BOCK, JASON BRADLEY, PAUL COPELIN, KENNETH GRUNWALD, BIJAN HOOSHYAR, WILLIAM KELLEY, NICHOLAS KING, JACOB MORGANO, MARISSA RITTER, and SEAN ZLATNIK,<br><br>　　　　　Defendants. | No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

COMPLAINT – 1

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**INTRODUCTION**

1.      Plaintiff Valve Corporation ("Valve") brings this complaint to enjoin Defendants Jenneen Alshalaldeh, Dylan Bartell, Lincoln Bock, Jason Bradley, Paul Copelin, Kenneth Grunwald, Bijan Hooshyar, William Kelley, Nicholas King, Jacob Morgano, Marissa Ritter, and Sean Zlatnik ("Defendants") from continuing to pursue their arbitrations against Valve before the American Arbitration Association ("AAA") because there is no agreement to arbitrate between the parties. Valve's request for relief does not leave Defendants—putative members of a proposed class pursuing similar antitrust claims in a case pending in this Court—without a way to pursue their claims. It merely asks the Court to answer a simple legal question: Whether Defendants may arbitrate their claims—even though there is no arbitration agreement between the parties—or must resolve their claims in court.[1]

2.      Defendants are attempting to pursue arbitration of their purported antitrust claims against Valve under a superseded version of the Steam Subscriber Agreement ("SSA") between Valve and Steam users that included an arbitration agreement and class action waiver (the "Superseded SSA").

3.      On September 26, 2024, Valve implemented a new SSA (the "Current SSA," Ex. 1) to remove the arbitration agreement and class action waiver. Valve did so after (i) an arbitrator ruled in four separate arbitrations that the arbitration agreement in the Superseded SSA was unenforceable and (ii) claimants' counsel in those four arbitrations filed a putative class action in this Court, *Elliott v. Valve Corporation*, No. 2:24-cv-01218 (W.D. Wash. filed Aug. 9, 2024), asserting substantially similar antitrust claims on behalf of a nationwide class of Valve consumers. The complaint asserted that the arbitration agreement was unenforceable as to the entire putative class (including Defendants) and that Steam users could proceed in court on a class-wide basis based on that arbitrator's rulings. This Court has consolidated *Elliott* with an earlier-filed consumer

---

[1] Defendant Alshalaldeh has proffered no evidence that she has an account on Valve's Steam platform and therefore might have no claim against Valve under Defendants' Counsel's theory of liability.

COMPLAINT - 2

class action, *In re Valve Antitrust Litigation*, No. 2:21-cv-00563-JNW ("*Wolfire*") (in which Defendants' former counsel in arbitration Vorys, Sater, Seymour and Pease ("Vorys"), is counsel to consumer plaintiffs), and with two other later-filed actions, *Hepler v. Valve Corporation*, No. 2:24-cv-01735 (W.D. Wash. filed Oct. 23, 2024), and *Drake v. Valve Corporation*, No. 2:24-cv-01743 (W.D. Wash. filed Oct. 24, 2024). *Wolfire* remains pending.

4.      Eleven of the 12 Defendants received conspicuous notice of the Current SSA and agreed to it either affirmatively through pop-up or purchase, through continued use of Steam, or affirmatively when signing up for a Steam account after the Current SSA was implemented. They are therefore bound by the Current SSA.

5.      The Current SSA requires that all claims, including claims that arose before the Current SSA became effective, to proceed in court:

> You and Valve agree that disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction.

6.      The Current SSA also provides that it "constitutes and contains the entire agreement between the parties with respect to the subject matter hereof and supersedes any prior oral or written agreements."

7.      Under well-settled law, the underlying claims brought in arbitration by the 11 Defendants who are bound by the Current SSA must be resolved exclusively in court.

8.      The final Defendant has provided no evidence that she had a Steam account at any time. She therefore cannot show that she has an agreement to arbitrate with Valve (or that she has any claim against Valve, for that matter).

9.      Accordingly, Defendants should be enjoined from pursuing their arbitrations. Defendants will remain free to prosecute their claims (if any) in court in the putative *Wolfire* class action or otherwise.

COMPLAINT – 3

**NATURE OF THE ACTION**

10.    Defendants' Counsel Mason & Perry LLP ("Mason") and Siri & Glimstad LLP ("Siri & Glimstad") are attempting to pursue before the AAA not just Defendants' arbitrations, but arbitrations on behalf of 19,903 other claimants. Mason has also threatened to file arbitrations against Valve on behalf of more than 100,000 other individuals.

11.    On December 15, 2023, Mason and its then co-counsel Vorys submitted 14,992[2] demands for arbitration with the AAA pursuant to the arbitration agreement in the Superseded SSA (the "December 2023 Arbitrations"), including on behalf of Defendants Grunwald, Kelley, Morgano, and Zlatnik (collectively, the "December 2023 Defendants").[3]

12.    In April 2024, Mason and Vorys submitted another 5,000 claims with the AAA pursuant to the arbitration agreement in the Superseded SSA (the "April 2024 Arbitrations"), including on behalf of Defendants Alshalaldeh, Bradley, Copelin, and Hooshyar (collectively, the "April 2024 Defendants"), making identical substantive allegations as in the December 2023 Arbitrations.

13.    In April 2026, Mason and its co-counsel, Siri & Glimstad (together, "Defendants' Counsel") submitted four additional claims with the AAA pursuant to the Superseded SSA, on behalf of Defendants Bartell, Bock, King, and Ritter.

14.    On July 8, 2024, Bucher Law PLLC ("Bucher Law") obtained four rulings before a merits arbitrator holding that the arbitration agreement in the Superseded SSA was unenforceable. This Court previously held in *Wolfire* that enforceability of the arbitration agreement in the Superseded SSA was an issue to be decided by an arbitrator. *See Wolfire Games, LLC v. Valve Corp.*, No. 2:21-cv-00563-JCC, 2021 WL 4952220, at \*1 (W.D. Wash. Oct. 25,

---

[2] Mason later withdrew 81 Claimants from the December 2023 Arbitrations without explanation, reducing that pool to 14,911 Claimants.

[3] Vorys remained arbitration counsel until October 23, 2024. Weeks earlier, Vorys had represented to this Court that it should lift the stay in *Wolfire* to permit the putative consumer class action proceed with respect to a nationwide class of Valve consumers with the exception of one, Ryan Lally.

COMPLAINT – 4

2021).

15. On August 9, 2024, Bucher Law and its co-counsel filed *Elliott* asserting antitrust claims on behalf of a putative nationwide class of Valve consumers, including Defendants. Bucher Law and its co-counsel asserted that all Steam users' claims belonged in court because Bucher Law had "**won binding decisions from arbitrators rendering Valve's arbitration provision unenforceable**." Complaint ¶ 13, *Elliott*, Dkt. 1 (emphasis added).

16. As a result of the arbitrator's rulings and the filing of the new class action, on September 26, 2024, Valve began notifying Steam users that the SSA was being updated to remove the arbitration agreement and class action waiver.

17. The Current SSA provides that all claims and disputes between Valve and Steam users must proceed in court, including claims and disputes that arose before Valve implemented the Current SSA.

18. Eleven Defendants, including Defendants Bartell, Bock, Bradley, Copelin, Grunwald, Hooshyar, Kelley, King, Morgano, Ritter, and Zlatnik (collectively, the "Steam User Defendants"), agreed to and are bound by the Current SSA. The Current SSA requires their claims to proceed in court.

19. One Defendant, Defendant Alshalaldeh, has provided no evidence that she has a Steam account, and thus that she has or ever had an agreement to arbitrate with Valve.

20. Defendants' arbitrations are at a preliminary stage. No arbitrator has been selected and no substantive proceedings have occurred in their arbitrations. The majority of Defendants have not even been assigned an AAA case administrator.

21. Notwithstanding the arbitrator's rulings in the Bucher Law matters that the arbitration agreement is unenforceable, the new putative class action asserting overlapping claims, and Valve's removal of the arbitration agreement from the SSA, Mason continued to pursue arbitration claims before the AAA.

22. With respect to 14,911 Mason claimants, including the December 2023 Defendants,

COMPLAINT – 5

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

the AAA issued Valve an invoice of $20.875 million in case management fees. Valve declined to pay the fees, as is Valve's right under the AAA rules, on the ground that there is no agreement to arbitrate in the Current SSA. Mason then commenced a series of duplicative litigations to compel Valve to pay the case management fees. Mason filed a motion in *Wolfire* demanding that Valve pay the case management fees for 14,911 claimants, including the December 2023 Defendants, as a "sanction." Mason also filed two putative class actions that are now pending before this Court, *Welty v. Valve Corp.*, No. 2:25-cv-02450 (W.D. Wash. filed May 2, 2025), and *Smith v. Valve Corp.*, No. 2:25-cv-01478 (W.D. Wash. filed Aug. 5, 2025), seeking the same relief: an order compelling Valve to pay the case management fees. Defendant Hooshyar is a member of the putative class in *Welty*; Defendant Alshalaldeh would be too if she had a Steam account. The December 2023 Defendants are members of the putative class in *Smith*.

23. The AAA referred the claims of the 5,000 other Mason claimants, including the April 2024 Defendants, to a Process Arbitrator. On February 9, 2026, the Process Arbitrator stayed those cases, ruling that only a court can decide which agreement applies to the claimants as between the Superseded SSA and Current SSA. (Ex. 2 at 11.)

24. On April 3, 2026, Defendants' Counsel asked the AAA to proceed with administering the arbitrations of two December 2023 Arbitrations, including Defendant Morgano's arbitration. On April 17, 2026, the AAA indicated that the matters are assigned for administration to Billy Crow, Manager of ADR Services.

25. On April 9, 2026, Defendants' Counsel asked the AAA to proceed with administering the arbitrations of three additional December 2023 Arbitrations, including Defendants Grunwald and Zlatnik's arbitrations. On April 17, 2026, the AAA indicated that these matters are also assigned for administration to Mr. Crow.

26. On April 10, 2026, Defendants' Counsel asked the AAA to proceed with administering the arbitration of one additional December 2023 Defendant: Kelley. On April 17, 2026, the AAA indicated that this matter is assigned for administration to Mr. Crow.

COMPLAINT – 6

27.     On April 10, 2026, Defendants' Counsel asked the AAA to proceed with administering the arbitrations of four April 2024 Defendants: Alshalaldeh, Bradley, Copelin, and Hooshyar. No AAA administrator has been assigned to these cases yet.

28.     Also, on April 10, 2026, Defendants' Counsel asked the AAA to proceed with administering the arbitrations of Defendants Bartell, Bock, King and Ritter, although no demands for arbitration had been submitted for any of these individuals at that time. Mason submitted demands for these Defendants five days later, on April 15, 2026.

29.     Based on Valve's preliminary analysis of Mason's overall claimant pool of more than 100,000 putative claimants, there appear to be (i) more than 200 putative claimants who are deceased (including 10 whose claims Mason has filed with the AAA); (ii) more than 350 putative claimants who appear to be in active bankruptcy proceedings; and (iii) claimants who appear to have been minors at the time their claims were filed. Mason also appears to be pursuing or threatening claims on behalf of more than 1,400 claimants who are represented by one or two other law firms pursuing the same claims, including Defendants Bartell and Hooshyar.

30.     Mason's goal is not to arbitrate claimants' disputes. Instead, its gambit is to leverage AAA administrative filing fees to force Valve to acquiesce to a settlement untethered to the merits of the claims. Mason has received litigation funding from Bench Walk 22m, L.P., an affiliate of Bench Walk Advisors LLC (collectively, "Bench Walk"), to pursue Mason's mass arbitration strategy. (Exs. 3, 4.)

31.     Other law firms are also pursuing similar mass arbitrations asserting antitrust claims against Valve, including Bucher Law and Labaton Keller Sucharow LLP ("Labaton"). Bucher and Labaton have also received litigation funding from Bench Walk. (Exs. 5, 6.)

32.     The Steam User Defendants agreed to the Current SSA. Defendant Alshalaldeh never entered into any arbitration agreement with Valve. The AAA therefore lacks jurisdiction to adjudicate Defendants' disputes. Accordingly, Valve respectfully requests an order enjoining Defendants' arbitrations.

COMPLAINT – 7

## THE PARTIES

33. Plaintiff Valve is a corporation organized under the laws of Washington state, with its principal place of business in King County, Washington.

34. Defendant Jenneen Alshalaldeh is an individual residing in Redondo Beach, California. Valve has been unable to locate a Steam account for Defendant Alshalaldeh based on the information provided by Defendants' Counsel. Defendant Alshalaldeh is among 19,915 claimants Mason purports to represent in arbitration against Valve before the AAA.

35. Defendant Dylan Bartell is an individual residing in Versailles, Pennsylvania. Based on account information provided by Defendants' Counsel, Defendant Bartell has been a Steam user since 2013. Defendant Bartell is among 19,915 claimants Mason purports to represent in arbitration against Valve before the AAA.

36. Defendant Lincoln Bock is an individual residing in Puyallup, Washington. Based on account information provided by Defendants' Counsel, Defendant Bock has been a Steam user since 2018. Defendant Bock is among 19,915 claimants Mason purports to represent in arbitration against Valve before the AAA.

37. Defendant Jason Bradley is an individual residing in Atlanta, Georgia. Based on account information provided by Defendants' Counsel, Defendant Bradley has been a Steam user since 2010. Defendant Bradley is among 19,915 claimants Mason purports to represent in arbitration against Valve before the AAA.

38. Defendant Paul Copelin is an individual residing in Tacoma, Washington. Based on account information provided by Defendants' Counsel, Defendant Copelin has been a Steam user since 2008. Defendant Copelin is among 19,915 claimants Mason purports to represent in arbitration against Valve before the AAA.

39. Defendant Kenneth Grunwald is an individual residing in Apex, North Carolina. Based on account information provided by Defendants' Counsel, Defendant Grunwald has been a Steam user since 2016. Defendant Grunwald is among 19,915 claimants Mason purports to

COMPLAINT – 8

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

represent in arbitration against Valve before the AAA.

40.     Defendant Bijan Hooshyar is an individual residing in Newbury Park, California. Based on account information provided by Defendants' Counsel, Defendant Hooshyar has been a Steam user since 2004. Defendant Hooshyar is among 19,915 claimants Mason purports to represent in arbitration against Valve before the AAA.

41.     Defendant William Kelley is an individual residing in Berwyn, Pennsylvania. Based on account information provided by Defendants' Counsel, Defendant Kelley has been a Steam user since 2005. Defendant Kelley is among 19,915 claimants Mason purports to represent in arbitration against Valve before the AAA.

42.     Defendant Nicholas King is an individual residing in Orangevale, California. Based on account information provided by Defendants' Counsel, Defendant King has been a Steam user since 2013. Defendant King is among 19,915 claimants Mason purports to represent in arbitration against Valve before the AAA.

43.     Defendant Jacob Morgano is an individual residing in Joliet, Illinois. Based on account information provided by Defendants' Counsel, Defendant Morgano has been a Steam user since 2012. Defendant Morgano is among 19,915 claimants Mason purports to represent in arbitration against Valve before the AAA.

44.     Defendant Marissa Ritter is an individual residing in Peoria, Arizona. Based on account information provided by Defendants' Counsel, Defendant Ritter has been a Steam user since 2011. Defendant Ritter is among 19,915 claimants Mason purports to represent in arbitration against Valve before the AAA.

45.     Defendant Sean Zlatnik is an individual residing in Corvallis, Oregon. Based on account information provided by Defendants' Counsel, Defendant Zlatnik has been a Steam user since 2017. Defendant Zlatnik is among 19,915 claimants Mason purports to represent in arbitration against Valve before the AAA.

COMPLAINT – 9

**JURISDICTION AND VENUE**

46.    This Court has jurisdiction under 9 U.S.C. § 4 and 28 U.S.C. §§ 1331 and 1367 because the underlying controversy involves claims arising under the laws of the United States—the Sherman Act, 15 U.S.C. §§ 1, 2.

47.    Venue is appropriate in this Court because Section 10 of the Current SSA provides:

> You and Valve agree that all disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction.

(Ex. 1 § 10.) The Superseded SSA also required that disputes brought in court proceed in any state or federal court located in King County, Washington, with subject matter jurisdiction.

48.    Venue is also appropriate in this Court under 28 U.S.C. §§ 1391(b)(2).

49.    This Court has personal jurisdiction because Section 10 of the Current SSA provides:

> You and Valve hereby consent to the exclusive jurisdiction of [any state or federal court located in King County, Washington, having subject matter jurisdiction] and waive any objections as to personal jurisdiction or venue in such courts.

(*Id*.) The Superseded SSA also provided that the parties agreed to the exclusive jurisdiction of courts located in King County, Washington.

50.    This Court also has personal jurisdiction under RCW 4.28.185 because Defendants assert that they transacted business with Valve, which is located in Washington State, and that their claims are related to such transactions.

**SUMMARY OF FACTS**

**A.    Valve, the Steam Platform, and the SSA**

51.    Valve is a video game developer, publisher, and digital distribution company. Valve offers an online platform called Steam, where consumers can purchase, play, and interact with their friends about video games.

COMPLAINT – 10

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

52.    For an individual to create a Steam account and become a Steam user, they must first agree to the SSA.

53.    Valve has periodically modified the SSA since it was first implemented in 2003.

54.    In 2012, Valve added to the SSA an arbitration agreement, providing that, with limited exceptions, users and Valve "agree to resolve all disputes and claims between us in the individual binding arbitration" with the AAA.

55.    The 11 Steam User Defendants first agreed to the SSA between 2004 and 2018 and continued to use Steam and agreed to the SSA every time they made purchase thereafter:

- Based on account information provided by Defendants' Counsel, Defendant Bartell agreed to the SSA on March 6, 2013, and, on information and belief, created a new Steam account, and agreed to the Current SSA, on March 13, 2025.

- Based on account information provided by Defendants' Counsel, Defendant Bock agreed to the SSA on November 23, 2018.

- Based on account information provided by Defendants' Counsel, Defendant Bradley agreed to the SSA on January 8, 2010.

- Based on account information provided by Defendants' Counsel, Defendant Copelin agreed to the SSA on December 9, 2008.

- Based on account information provided by Defendants' Counsel, Defendant Grunwald agreed to the SSA on April 3, 2016.

- Based on account information provided by Defendants' Counsel, Defendant Hooshyar agreed to the SSA on January 28, 2004.

- Based on account information provided by Defendants' Counsel, Defendant Kelley agreed to the SSA on September 16, 2005.

- Based on account information provided by Defendants' Counsel, Defendant King agreed to the SSA on February 13, 2013.

COMPLAINT – 11

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

- Based on account information provided by Defendants' Counsel, Defendant Morgano agreed to the SSA on June 20, 2012.
- Based on account information provided by Defendants' Counsel, Defendant Ritter agreed to the SSA on April 24, 2011.
- Based on account information provided by Defendants' Counsel, Defendant Zlatnik agreed to the SSA on March 8, 2017.

56. On September 26, 2024, Valve provided notice to Steam users, including the Steam User Defendants, that the arbitration agreement and class action waiver were being removed from the SSA effective (i) "immediately when you agree to it, including when you make most purchases, fund your Steam wallet, or otherwise accept it" or otherwise (ii) on November 1, 2024.

57. Valve provided multiple forms of notice to Steam users about the Current SSA. On or around September 26, 2024, Valve added a banner at the top of the SSA prominently announcing: "Valve has updated the Steam Subscriber Agreement. The updates affect your legal rights, including how disputes and claims between you and Valve are resolved. Among other things, the new dispute resolution provisions in Section 10 require that all disputes and claims proceed in court and not in arbitration. Please review carefully." The banner is set forth below.

58. Valve also provided notice of the change of the SSA to Steam users in three other ways.

COMPLAINT – 12

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

59.    First, beginning on September 26, 2024, Valve provided the email notice shown below to all U.S. Steam users, including the Steam User Defendants, of the change to the SSA (the "Email Notice"), sending the notice to the email address of record for their Steam accounts. The Email Notice specifically called out changes to the dispute resolution provision:



60.    The Email Notice included multiple links to the full text of the Current SSA, shown in the blue text above.

61.    The Email Notice explained: "This updated Steam Subscriber Agreement will

COMPLAINT – 13

become effective immediately when you agree to it, including when you make most purchases, fund your Steam wallet, or otherwise accept it."

62.    The Email Notice further provided: "Otherwise, the updated Steam Subscriber Agreement will become effective on November 1, 2024, unless you delete or discontinue use of your Steam account before then."

63.    The Email Notice also explained how users could delete their Steam account.

64.    Second, beginning on September 26, 2024, Valve provided notice of the new agreement through the below pop-up that appeared on the Steam client (the "Pop-Up Notice"). The Pop-Up Notice provided:



65.    In addition to calling out the changes to the dispute resolution provision, the Pop-Up Notice included multiple links to the full text of the Current SSA, shown in blue text above.

COMPLAINT – 14

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

66.    The Pop-Up Notice enabled users to agree to the Current SSA by checking a box stating: "I Agree to the Updated Steam Subscriber Agreement" then clicking "Accept Updated SSA."

67.    Alternatively, users could close the Pop-Up Notice without agreeing to the Current SSA, as indicated by the "X" at the top right corner of the pop-up.

68.    Third, beginning on September 26, 2024, Valve published the below blog post on the Steam platform providing notice of the change to the SSA, available at https://store.steampowered.com/news/app/593110/view/4696781406111167991 (the "Blog Post"). The Blog Post provided:



69.    The Blog Post included multiple prominent and easily accessible links to the full text of the Current SSA, shown in blue text above.

COMPLAINT – 15

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

70.     A "Steam Wallet" contains funds that may be used for the purchase of any game on Steam or content within a game that supports Steam transactions.

71.     Users must accept the Current SSA every time they fund their Steam Wallet or make a purchase on Steam itself[4] after September 26, 2024.

72.     Consistent with the Email Notice and Pop-Up Notice, when a user makes a purchase on Steam, the user is presented with an unchecked box requiring the user to check the box and accept the Current SSA, which is hyperlinked in white text to the words "Steam Subscriber Agreement" shown below:



_____

[4] As opposed to a purchase made using Steam Wallet funds from within a game launched through Steam.

COMPLAINT – 16

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

73.    Consistent with the Email Notice and Pop-Up Notice, when a user funds their Steam Wallet, the user is presented with an unchecked box requiring the user to check the box and accept the Current SSA, which is hyperlinked in white text to the words "Steam Subscriber Agreement" shown below:



74.    As of September 26, 2024, individuals who open new Steam accounts must also agree to the Current SSA.

COMPLAINT – 17

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

75.     As shown below, to open a Steam account, an individual must check a box stating "I am 13 years of age or older and agree to the terms of the **Steam Subscriber Agreement** and the Valve Privacy Policy" and click "Continue."

Browse ⌄   Recommendations ⌄   Categories ⌄   More ⌄   Search the store

## CREATE YOUR ACCOUNT

Email Address

Confirm your Email Address

Country of Residence

United States

☐ I am human   hCaptcha  Privacy - Terms

☐ I am 13 years of age or older and agree to the terms of the **Steam Subscriber Agreement** and the **Valve Privacy Policy**.

Continue

76.     The words "Steam Subscriber Agreement" are bolded and are a hyperlink to the Current SSA.

COMPLAINT – 18

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**B.    The Eleven Steam User Defendants Agree to the Current SSA and to Proceed with All Claims in Court**

77.    Based on account information provided by Defendants' Counsel, three Defendants affirmatively accepted the Current SSA before November 1, 2024:

- Defendant Bradley affirmatively accepted the Current SSA on October 1, 2024, when making a purchase on Steam by checking the box next to "I agree to the terms of the Steam Subscriber Agreement (last updated Sep 26, 2024)" and clicking the "Purchase" button.

- Defendant Copelin affirmatively accepted the Current SSA on October 3, 2024, by checking a box in the Pop-Up Notice stating: "I Agree to the Updated Steam Subscriber Agreement" and then clicking "Accept Updated SSA."

- Defendant Hooshyar affirmatively accepted the Current SSA on September 27, 2024, by checking a box in the Pop-Up Notice stating: "I Agree to the Updated Steam Subscriber Agreement" and then clicking "Accept Updated SSA."

78.    Defendants Bradley, Copelin, and Hooshyar are therefore bound by the Current SSA.

79.    Based on account information provided by Defendants' Counsel, seven Defendants are bound by the Current SSA because they received notice of its terms through the Email Notice and Pop-Up Notice and did not delete or discontinue use of their Steam account by November 1, 2024. In particular:

- Defendant Bock logged into his Steam account on November 16, 2024, and continued to log in thereafter through at least September 17, 2025.

- Defendant Grunwald logged into his Steam account on November 1, 2024, and over 1,180 times between that date and February 15, 2025.

- Defendant Kelley continued to log into his Steam account after November 1, 2024, and continued to log in thereafter through at least April 14, 2026.

COMPLAINT – 19

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Defendant Kelley continued to play games on Steam through at least April 15, 2026.

- Defendant King logged into his Steam account on November 1, 2024, and 14 times between that date and November 24, 2024.

- Defendant Morgano logged into his Steam account three times on November 22, 2024.

- Defendant Ritter logged into her Steam account on November 11, 2024, and continued to log in thereafter through at least March 30, 2026.

- Defendant Zlatnik logged into his Steam account on November 1, 2024, and continued to log in thereafter through at least April 14, 2026.

80.    In addition, on November 24, 2024, Defendant King affirmatively accepted the Current SSA when making a purchase on Steam by checking the box next to "I agree to the terms of the Steam Subscriber Agreement (last updated Sep 26, 2024)" and clicking the "Purchase" button.

81.    Defendants Bock, King, Kelley, Grunwald, Ritter, Zlatnik, and Morgano are therefore bound by the Current SSA.

82.    Defendant Bartell is bound by the Current SSA because, on information and belief, on March 13, 2025, he opened a new Steam account and thereby assented to the Current SSA. When opening his new account, Defendant Bartell checked a box stating "I am 13 years of age or older and agree to the terms of the **Steam Subscriber Agreement** and the Valve Privacy Policy" and clicked "Continue."

83.    The Current SSA does not contain an arbitration agreement.

84.    The Current SSA provides that all claims and disputes, including claims and disputes that arose before the effective date of the Current SSA, must proceed in court in Washington:

> You and Valve agree that all disputes and claims between you and Valve (including any dispute or claim that arose before the existence

COMPLAINT – 20

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction.

(*See* Ex. 1 § 10 (*available at* https://store.steampowered.com/subscriber_agreement/).)

85.     The Current SSA contains a merger clause providing as follows:

This Agreement, including any Subscription Terms, Rules of Use, the Valve Privacy Policy, and the Valve Hardware Limited Warranty Policy, constitutes and contains the entire agreement between the parties with respect to the subject matter hereof and supersedes any prior oral or written agreements.

(*See* Ex. 1 § 11 (*available at* https://store.steampowered.com/subscriber_agreement/).)

**C.     Defendant Alshalaldeh Has No Arbitration Agreement With Valve**

86.     On information and belief, Defendant Alshalaldeh never created a Steam account.

87.     Valve has been unable to locate a Steam account for Defendant Alshalaldeh based on the account information provided by Defendants' Counsel.

88.     Although Defendants' Counsel provided a Steam ID that they claimed belonged to Defendant Alshalaldeh, based on Valve's records that Steam ID does not match the email address or phone number Defendants' Counsel provided for Defendant Alshalaldeh. Valve also found no other Steam account that matched the email address or phone number Defendants' Counsel provided for Defendant Alshalaldeh.

89.     Because Defendant Alshalaldeh never created a Steam account, she never agreed to the SSA or to arbitrate with Valve.

**D.     Valve Reimburses AAA Filing Fees and Vorys Moves to Lift the Stay in *Wolfire***

90.     On September 27, 2024, Valve informed Defendants' then-counsel, Vorys and Mason, that Valve had "removed the arbitration agreement from the SSA." Valve also informed Vorys and Mason that Valve would reimburse their clients' arbitration filing fees.

91.     On October 1, 2024, Vorys and Mason accepted Valve's offer to reimburse them for their clients' AAA filing fees, including the December 2023 and April 2024 Defendants' fees.

COMPLAINT – 21

Valve reimbursed Vorys and Mason for their claimants' AAA filing fees in the amount of $1,518,325.00.

**E.    The AAA Administratively Stays the December 2023 Defendants' Arbitrations and Mason Commences Litigation**

92.    On May 15, 2025, the AAA administratively stayed the December 2023 Defendants' arbitrations and 14,907 other December 2023 arbitrations Mason was pursuing at Mason's request.

93.    Mason then commenced two overlapping class actions and a duplicative motion for sanctions all aimed at forcing Valve to pay the $20.875 million AAA invoice.

**F.    A Process Arbitrator Stays the April 2024 Defendants' Arbitrations**

94.    Valve requested that the AAA close the April 2024 Arbitrations because there was no longer an agreement to arbitrate. The AAA appointed a Process Arbitrator to address this initial administrative issue.

95.    On February 9, 2026, that Process Arbitrator ordered that the April 2024 arbitrations be stayed "pending resolution by a court of the issue of whether the [Superseded] SSA or [Current] SSA governs the April 2024 Arbitrations."

**G.    Mason States Its Intention to Advance Fees for the Arbitration of One Claimant Who Is Not a Defendant in This Action**

96.    On December 17, 2025, seven months after the AAA stayed the December 2023 Arbitrations, Mason informed the AAA that one of the December 2023 Arbitration claimants, Jason Irias, who is not a Defendant in this action, "has elected to move forward with his arbitration claim against Valve." Mason has represented that it will seek an order of the arbitrator requiring Valve to repay the case management fees Mason claims it will advance in the claimant's arbitration.

97.    On February 6, 2026, the AAA informed the parties that it would proceed with the appointment of a merits arbitrator in Mr. Irias's case over Valve's objection.

COMPLAINT – 22

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

98.     On February 27, 2026, Valve commenced an action in this Court, captioned *Valve Corporation v. Irias*, No. 26-cv-00698, to enjoin Irias's arbitration because Irias had accepted the Current SSA and therefore there is no agreement to arbitrate between the parties.

99.     On March 10, 2026, the AAA placed Irias's arbitration in abeyance in light of the court action.

**H.     Defendants' Counsel Request to Proceed With the Arbitrations of Six Additional Claimants From the December 2023 Arbitrations**

100.     On April 3, 2026, four months after requesting to proceed with Jason Irias's arbitration, and almost a year after the AAA had stayed the December 2023 Arbitrations, Defendants' Counsel wrote to the AAA seeking to proceed with the cases of two additional claimants from the December 2023 Arbitrations: Defendant Morgano and one other claimant. Valve represented to the AAA that it was prepared to proceed with this one other claimant's case (but not Defendant Morgano's). Valve explained that, based on its business records, the claimant had not logged onto the Steam platform during the relevant timeframe and thus had not accepted the Current SSA. Valve conditioned its agreement to proceed on that claimant's submission of a sworn declaration confirming his desire to proceed given that his demand for arbitration indicated that the amount in dispute was just $2.15. Valve objected to proceeding with Defendant Morgano's case.

101.     On April 9, 2026, Defendants' Counsel wrote to the AAA seeking to proceed with the cases of three additional claimants from the December 2023 Arbitrations: Defendants Grunwald and Zlatnik and one other claimant. Valve represented to the AAA that it was prepared to proceed with this one other claimant's case (but not Defendants Grunwald or Zlatnik's). Valve explained that, based on its business records, the claimant had not logged onto the Steam platform during the relevant timeframe and thus had not accepted the Current SSA. Valve conditioned its agreement to proceed on that claimant's submission of a sworn declaration confirming his desire to proceed given that his demand for arbitration indicated that the amount in dispute was just $196.24. Valve objected to proceeding with Defendants Grunwald and Zlatnik's cases.

COMPLAINT – 23

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

102.   On April 10, 2026, Defendants' Counsel wrote to the AAA seeking to proceed with the case of one additional claimant from the December 2023 Arbitrations: Defendant Kelley. Valve objected to this request.

103.   On April 17, 2026, the AAA indicated that the arbitrations of Defendants Grunwald, Kelley, Morgano, and Zlatnik are now assigned for administration, and that the "next step is to appoint an arbitrator to serve."

## I.   Defendants' Counsel Request to Proceed With Four April 2024 Arbitrations

104.   On April 10, 2026, Defendants' Counsel wrote to the AAA seeking to proceed with the cases of four claimants from the AAA's April 2024 Arbitrations: Defendants Alshalaldeh, Bradley, Copelin, and Hooshyar.

105.   On April 22, 2026, Valve submitted a letter to the AAA requesting it decline Defendants' Counsel's attempts to proceed with any arbitrations subject to the Process Arbitrator's stay of the April 2024 Arbitrations, including the arbitrations of Defendants Alshalaldeh, Bradley, Copelin, and Hooshyar.

## J.   Defendants' Counsel Request to Proceed With Four Newly-Commenced Arbitrations

106.   On April 10, 2026, Defendants' Counsel wrote to the AAA seeking to proceed with the cases of Defendants Bartell, Bock, King, and Ritter, although no demands for arbitration had been submitted for these four Defendants.

107.   On April 15, 2026, Defendants' Counsel submitted demands for arbitration for Defendants Bartell, Bock, King, and Ritter.

108.   In correspondence dated April 17, 2026, and April 22, 2026, Valve objected to the AAA administering the cases.

109.   On April 28, 2026, the AAA informed the parties that it would proceed to appoint arbitrators.

110.   On April 30, 2026, the AAA sent a letter stating that the AAA was "in receipt of a court order compelling arbitration" and that accordingly, they "are proceeding on that basis." The

COMPLAINT – 24

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

order was the order in *Wolfire* compelling other individuals who are not Defendants to arbitrate under the Superseded SSA. The AAA then sent invoices for Valve's share of filing fees for the four matters.

111. On April 30, 2026, Valve submitted a letter to the AAA reiterating that the AAA must decline to administer the arbitrations of Bartell, Bock, King, and Ritter. As Valve explained, the order Defendants' Counsel attached with these Defendants' demands for arbitration, from *Wolfire*, did not involve and has no bearing on these Defendants.

112. The AAA responded on May 4, 2026, again reiterating it would proceed to administer the claims.

**K.   Valve Is Suffering and Will Continue To Suffer Irreparable Harm**

113. Valve is suffering, and absent an order enjoining Defendants' arbitrations, will continue to suffer irreparable harm if Defendants' arbitrations proceed because there is no arbitration agreement between the parties.

114. Although Valve has requested that the AAA close Defendants' arbitrations administratively for lack of jurisdiction, the AAA will not address the request and instead intends to appoint merits arbitrators.

115. An arbitrator cannot decide the parties' dispute as to whether there is an arbitration agreement, including, with respect to the Steam User Defendants, whether the Superseded SSA or the Current SSA governs. Only a court can make those determinations.

116. If Defendants' arbitrations proceed, Valve will devote substantial time and resources towards defending arbitrations Defendants have no right to pursue in the first place.

117. Absent an injunction, Valve may incur needless expenses vacating arbitral awards in arbitrations that Defendants have no right to pursue.

118. Valve is also irreparably harmed by being forced to defend against duplicative litigation in *Welty* and *Smith*, in which actions Mason demands, among other things, that Valve pay the case management fees in the December 2023 Defendants' arbitrations and Defendant

COMPLAINT – 25

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Alshalaldeh and Hooshyar's arbitrations.

**L.    The Balance of Equities Favors Valve**

119.    The balance of equities supports an injunction.

120.    Forcing Valve to engage in an arbitration where Defendants are not bound to arbitrate and instead must pursue their claims in court serves no equitable purpose.

121.    On the contrary, Valve has been and will continue to be subject to harassing and vexatious proceedings that Mason on behalf of Defendants and other arbitration claimants has no right to pursue.

122.    Defendants will also suffer no prejudice from an injunction. Defendants may pursue their claims in court (if they have any claims).

123.    In fact, there is already a putative class action in this Court, *Wolfire* (which was filed in 2021, well before Mason filed its arbitrations), asserting overlapping claims purportedly on behalf of a putative nationwide class that would include Defendants, although Valve contends that no class could be certified.

**M.    The Public Interest Favors an Injunction**

124.    There is no public interest in requiring Valve and Defendants to arbitrate disputes that must proceed in court and where any arbitral award will be subject to potential vacatur.

125.    Permitting arbitrations to proceed at the same time as parallel putative class actions, including *Wolfire*, *Welty*, and *Smith*, would be a manifest waste of judicial resources, although Valve contends that no class could be certified in any of these putative class actions.

**N.    Allowing Defendants' Arbitrations To Proceed Would Interfere with the Jurisdiction of This Court in *Wolfire* in Violation of the All Writs Act**

126.    Mason is seeking to pursue Defendants' antitrust claims in arbitration before the AAA.

127.    There is also a parallel putative class action in this Court, *Wolfire*, brought on behalf of a putative class that purports to include Defendants and encompasses the claims and relief sought in Defendants' arbitrations.

COMPLAINT - 26

128.   Any decisions, orders, or awards in Defendants' arbitrations may conflict with rulings of this Court in *Wolfire*. The plaintiffs in *Elliott* (an action that this Court later consolidated with *Wolfire*) conceded as much, averring, "[t]he prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for [Valve]." Complaint ¶ 176, *Elliott*, Dkt. 1. In the First Amended Complaint filed by Vorys in *Colvin v. Valve Corporation*, No. 21-cv-00801 (C.D. Cal. filed Apr. 8, 2021), an action that this Court later consolidated with *Wolfire*, the plaintiffs likewise averred that "[t]he prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for [Valve]." First Am. Compl. ¶ 139, *Colvin*, Dkt. 34.

129.   In addition, Mason has filed a motion for sanctions in *Wolfire* seeking an order requiring Valve to pay the case management fees in the December 2023 Defendants' arbitrations and the 14,907 other December 2023 arbitrations.

130.   Mason has also filed putative class actions in *Welty* and *Smith* seeking orders requiring Valve to pay the case management fees in arbitrations Mason is attempting to pursue before the AAA. The putative class in *Welty* includes Defendant Hooshyar and would also include Defendant Alshalaldeh if she had a Steam account. The putative class in *Smith* includes the December 2023 Defendants.

131.   It would threaten the jurisdiction of this Court and any judgment of this Court in *Welty* and *Smith* for Defendants' arbitrations to proceed because the arbitrations could result in rulings inconsistent with the rulings of this Court.

### FIRST CAUSE OF ACTION
(Steam User Defendants)

### DECLARATORY JUDGMENT THAT THE CURRENT SSA IS VALID AND ENFORCEABLE AND REQUIRES DEFENDANTS TO PURSUE THEIR CLAIMS AGAINST VALVE IN COURT

132.   Valve realleges and incorporates by reference the allegations in Paragraphs 1

COMPLAINT – 27

through 131 as if fully set forth herein.

133.    The Steam User Defendants received notice of the Current SSA.

134.    Valve and the Steam User Defendants have assented to the Current SSA.

135.    The Current SSA requires the Steam User Defendants to pursue their claims against Valve in court.

136.    Valve seeks a declaration pursuant to 28 U.S.C. § 2201 that (i) the Current SSA is valid and enforceable as to the Steam User Defendants, (ii) Valve and the Steam User Defendants have entered into the Current SSA, and (iii) the Current SSA requires the Steam User Defendants to pursue their claims against Valve in court.

## SECOND CAUSE OF ACTION
### (Steam User Defendants)

### BREACH OF CONTRACT

137.    Valve realleges and incorporates by reference the allegations in Paragraphs 1 through 131 as if fully set forth herein.

138.    Valve and the Steam User Defendants have entered into the Current SSA.

139.    Section 10 of the Current SSA provides that "disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction." (Ex. 1 § 10.)

140.    The Steam User Defendants are breaching the Current SSA by attempting to pursue their purported antitrust claims against Valve in arbitration.

141.    The Steam User Defendants' breach has caused and will continue to cause Valve to incur damages.

142.    Valve seeks equitable relief only and does not seek money damages against the Steam User Defendants.

COMPLAINT – 28

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**THIRD CAUSE OF ACTION**
(All Defendants)

**DECLARATORY JUDGMENT THAT DEFENDANTS MUST
PURSUE THEIR CLAIMS IN COURT AND INJUNCTIVE RELIEF**

143.    Valve realleges and incorporates by reference the allegations in Paragraphs 1 through 131 as if fully set forth herein.

144.    There is no arbitration agreement between Valve and any Defendant.

145.    Valve and the Steam User Defendants have entered into the Current SSA.

146.    Section 10 of the Current SSA provides that "disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction." (Ex. 1 § 10.)

147.    The Steam User Defendants are breaching the Current SSA by attempting to pursue their purported antitrust claims against Valve in arbitration.

148.    Defendant Alshalaldeh never agreed to any version of the SSA. Defendant Alshalaldeh has no agreement to arbitrate with Valve.

149.    Valve seeks (i) a declaration pursuant to 28 U.S.C. § 2201 that Defendants must pursue the claims that Mason is prosecuting on their behalf in arbitration before the AAA only in court (if at all), and (ii) an order pursuant to 28 U.S.C. §§ 2201-02 enjoining Defendants' arbitrations before the AAA, which Mason is prosecuting on Defendants' behalf.

**FOURTH CAUSE OF ACTION**
(All Defendants)

**INJUNCTIVE RELIEF UNDER THE ALL WRITS ACT**

150.    Valve realleges and incorporates by reference the allegations in Paragraphs 1 through 131 as if fully set forth herein.

151.    The Steam User Defendants are breaching the Current SSA by attempting to pursue their purported antitrust claims against Valve in arbitration.

COMPLAINT – 29

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

152. Defendant Alshalaldeh is attempting to pursue her purported antitrust claims against Valve in arbitration even though there is no arbitration agreement between her and Valve.

153. There is also a putative class action pending in this district, the *Wolfire* action, brought on behalf of a putative class that includes Defendants, that encompasses all of Defendants' claims and the relief Defendants seek in arbitration.

154. Mason has also filed a motion for sanctions in *Wolfire* seeking an order requiring Valve to pay the case management fees in the December 2023 Defendants' arbitrations and other arbitrations.

155. Mason has also filed a putative class action in *Smith* seeking an order requiring Valve to pay the case management fees in the December 2023 Defendants' arbitrations and other arbitrations.

156. Mason has also filed a putative class action in *Welty* seeking an order requiring Valve to pay case management fees in arbitrations Mason is pursuing before the AAA, including the arbitrations of Defendants Alshalaldeh and Hooshyar.

157. It would threaten the jurisdiction and any judgment of the court in *Wolfire*, *Smith*, and *Welty* for the arbitrations Mason is pursuing on behalf of Defendants to proceed because they could result in rulings inconsistent with a ruling of the *Wolfire*, *Smith*, and/or *Welty* court.

158. Thus, Valve seeks an order pursuant to 28 U.S.C. § 1651(a) enjoining the arbitrations before the AAA that Mason is prosecuting on Defendants' behalf.

## **PRAYER FOR RELIEF**

**WHEREFORE, Valve respectfully requests that this Court award the following relief:**

(a) A declaration pursuant to 28 U.S.C. § 2201 that the Current SSA is valid and enforceable as to the Steam User Defendants.

(b) A declaration pursuant to 28 U.S.C. § 2201 that Valve and the Steam User Defendants have entered into the Current SSA and the Steam User Defendants are

COMPLAINT – 30

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

bound by the Current SSA.

(c)    A declaration pursuant to 28 U.S.C. § 2201 that the Current SSA requires the Steam User Defendants to pursue their claims against Valve in court.

(d)    A declaration pursuant to 28 U.S.C. § 2201 that Valve and Defendant Alshalaldeh have no agreement to arbitrate and therefore that Valve has no obligation to arbitrate Defendant Alshalaldeh's claim.

(e)    An order pursuant to 9 U.S.C. § 4, 28 U.S.C. §§ 2201-02, and 28 U.S.C. § 1651(a), enjoining Defendants' arbitrations.

(f)    Any other relief that the Court deems just and appropriate.

DATED this 15th day of May 2026.

s/ Blake Marks-Dias
Blake Marks-Dias, WSBA No. 28169
CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
(206) 625-8600 Phone
(206) 625-0900 Fax
bmarksdias@corrcronin.com

Michael W. McTigue Jr., *Pro Hac Vice Forthcoming*
Meredith C. Slawe, *Pro Hac Vice Forthcoming*
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
(212) 735-3000 Phone
(212) 735-2000 Fax
michael.mctigue@skadden.com
meredith.slawe@skadden.com

*Attorneys for Plaintiff Valve Corporation*

COMPLAINT – 31

# EXHIBIT 1

Steam Subscriber Agreement



Install Steam    login | language

STORE   COMMUNITY   ABOUT   SUPPORT

Valve has updated the Steam Subscriber Agreement. The updates affect your legal rights, including how disputes and claims between you and Valve are resolved. Among other things, the new dispute resolution provisions in Section 10 require that all disputes and claims proceed in court and not in arbitration. Please review carefully.

Home

# Steam Subscriber Agreement



## STEAM® SUBSCRIBER AGREEMENT

Table of contents:

1. Registration as a subscriber; application of terms to you; your account; conclusion of agreements
2. Licenses
3. Billing, payment and other subscriptions
4. Online conduct, cheating and illegal behavior
5. Third-party content
6. User generated content
7. Disclaimers; limitation of liability; no guarantees; limited warranty & agreement
8. Amendments to this agreement
9. Term and termination
10. Applicable law/jurisdiction
11. Miscellaneous

This Steam Subscriber Agreement ("Agreement") is a legal document that explains your rights and obligations as a subscriber of Steam from Valve Corporation, a corporation under the laws of the State of Washington, with its registered office at 10400 NE 4th St., Bellevue, WA 98004, United States, registered with the Washington Secretary of State under number 60 22 90 773, VAT ID No. EU 8260 00671 ("Valve"). Please read it carefully.

1. REGISTRATION AS A SUBSCRIBER; APPLICATION OF TERMS TO YOU; YOUR ACCOUNT, ACCEPTANCE OF AGREEMENTS ▲

Steam is an online service offered by Valve.

You become a subscriber of Steam ("Subscriber") by completing the registration of a Steam user account. This Agreement takes effect as soon as you indicate your acceptance of these terms. You may not become a Subscriber if you are under the age of 13. Steam is not intended for children under 13 and Valve will not knowingly collect personal information from children under the age of 13. Additional age restrictions may apply in your country.

A. Contracting Party

For any interaction with Steam your contractual relationship is with Valve. Except as otherwise indicated herein or at the time of the transaction (such as in the case of purchases from another Subscriber in a Subscription Marketplace), any transactions for Subscriptions (as defined below) you make on Steam are being made from Valve.

B. Hardware, Subscriptions; Content and Services

As a Subscriber you may obtain access to certain services, software and content available to Subscribers or purchase certain Hardware (as defined below) on Steam. The Steam client software and any other software, content, and updates you download or access via Steam, including but not limited to Valve or third-party video games and in-game content, software associated with Hardware and any virtual items you trade, sell or purchase in a Steam Subscription Marketplace are referred to in this Agreement as "Content and Services;" the rights to access and/or use any Content and Services accessible through Steam are referred to in this Agreement as "Subscriptions."

Each Subscription allows you to access particular Content and Services. Some Subscriptions may impose additional terms specific to that Subscription ("Subscription Terms") (for example, an end user license agreement specific to a particular game, or terms of use specific to a particular product or feature of Steam). Also, additional terms (for example, payment and billing procedures) may be posted on http://www.steampowered.com or within the Steam service ("Rules of Use"). Rules of Use include the Steam Online Conduct Rules http://steampowered.com/index.php?area=online_conduct and the Steam Refund Policy http://store.steampowered.com/steam_refunds. The Subscription Terms, the Rules of Use, and the Valve Privacy Policy (which can be found at http://www.valvesoftware.com/privacy.htm) are binding on you once you indicate your acceptance of them or of this Agreement, or otherwise become bound by them as described in Section 8 (Amendments to this Agreement).

C. Your Account

When you complete Steam's registration process, you create a Steam account ("Account"). Your Account may also include billing information you provide to Valve for transactions concerning Subscriptions, Content and Services and the purchase of any physical goods through Steam ("Hardware"). You may not reveal, share or otherwise allow others to use your password or Account except as

otherwise specifically authorized by Valve. You are responsible for the confidentiality of your login and password and for the security of your computer system. Valve is not responsible for the use of your password and Account or for all of the communication and activity on Steam that results from use of your login name and password by you, or by any person to whom you may have intentionally or by negligence disclosed your login and/or password in violation of this confidentiality provision. Unless it results from Valve's negligence or fault, Valve is not responsible for the use of your Account by a person who fraudulently used your login and password without your permission. If you believe that the confidentiality of your login and/or password may have been compromised, you must notify Valve via the support form (https://support.steampowered.com/newticket.php) without any delay.

Your Account, including any information pertaining to it (e.g.: contact information, billing information, Account history and Subscriptions, etc.), is strictly personal. You may therefore not sell or charge others for the right to use your Account, or otherwise transfer your Account, nor may you sell, charge others for the right to use, or transfer any Subscriptions other than if and as expressly permitted by this Agreement (including any Subscription Terms or Rules of Use) or as otherwise specifically permitted by Valve.

D. Acceptance of Agreements

Your order through Steam is an offer to Valve to agree on the delivery of the ordered Subscriptions, Content and Services and/or Hardware (the "Product(s)") in exchange for the listed price.

When you place an order on Steam, we will send you a message confirming receipt of your order and containing the details of your order (the "Order Confirmation"). The Order Confirmation is acknowledgement that we have received your order and does not confirm acceptance of your offer to enter into an agreement.

In the case of Content and Services, we accept your offer, and conclude the agreement with you, by confirming the transaction and making the Content and Services available to you or, in the case of pre-orders, only by confirming the transaction to you and deducting the applicable price from your payment method.

In the case of Hardware, we only accept your offer, and conclude the transaction for an item ordered by you, when we dispatch the Hardware to you and send e-mail confirming to you that we've dispatched the Hardware to you (the "Dispatch Confirmation"). If your order is dispatched in more than one package, you may receive a separate Dispatch Confirmation for each package, and each Dispatch Confirmation and corresponding dispatch will conclude a separate contract of sale between us for the Hardware specified in that Dispatch Confirmation. Any Hardware delivered to you remains property of Valve until payment has been fully made.

You consent to receiving sales invoices electronically.

E. Payment Processing

Payment processing related to Content and Services and/or Hardware purchased on Steam is performed by either Valve Corporation directly or by Valve's fully owned subsidiary Valve GmbH on behalf of Valve Corporation depending on the type of payment method used. If your card was issued outside the United States, your payment may be processed via a European acquirer by Valve GmbH on behalf of Valve Corporation. For any other type of purchases, payment will be collected by Valve Corporation directly. In any case, delivery of Content and Services as well as Hardware is performed by Valve Corporation.

2. LICENSES ▲

A. General Content and Services License

Steam and your Subscription(s) require the download and installation of Content and Services onto your computer. Valve hereby grants, and you accept, a non-exclusive license and right, to use the Content and Services for your personal, non-commercial use (except where commercial use is expressly allowed herein or in the applicable Subscription Terms). This license ends upon termination of (a) this Agreement or (b) a Subscription that includes the license. The Content and Services are licensed, not sold. Your license confers no title or ownership in the Content and Services. To make use of the Content and Services, you must have a Steam Account and you may be required to be running the Steam client and maintaining a connection to the Internet.

For reasons that include, without limitation, system security, stability, and multiplayer interoperability, Valve may need to automatically update, pre-load, create new versions of or otherwise enhance the Content and Services and accordingly, the system requirements to use the Content and Services may change over time.

You consent to such automatic updating. You understand that this Agreement (including applicable Subscription Terms) does not entitle you to future updates (unless to the extent required by applicable law), new versions or other enhancements of the Content and Services associated with a particular Subscription, although Valve may choose to provide such updates, etc. in its sole discretion.

B. Beta Software License

Valve may from time to time make software accessible to you via Steam prior to the general commercial release of such software ("Beta Software"). You are not required to use Beta Software, but if Valve offers it, you may elect to use it under the following terms. Beta Software will be deemed to consist of Content and Services, and each item of Beta Software provided will be deemed a Subscription for such Beta Software, with the following provisions specific to Beta Software:

- Your right to use the Beta Software may be limited in time, and may be subject to additional Subscription Terms;

- Valve or any Valve affiliate may request or require that you provide suggestions, feedback, or data regarding your use of the Beta Software, which will be deemed User Generated Content under Section 6 (User Generated Content) below; and

- In addition to the waivers and limitations of liability for all Software under Section 7 (Disclaimers; Limitations on Liability; No Guarantees; Limited Warranty & Agreement) below as applicable, you specifically acknowledge that Beta Software is only released for testing and improvement purposes, in particular to provide Valve with feedback on the quality and usability of the Beta Software, and therefore contains errors and is not final. If you decide to install and/or use Beta Software, you shall only use it in compliance with its purposes, i.e. for testing and improvement purposes, in compliance with system requirements specifically intended for each Beta Software and in any case not on a system or for purposes where the malfunction of the Beta Software can cause any kind of damage. In particular, maintain full backups of any system that you choose to install Beta Software on.

C. License to Use Valve Developer Tools

Your Subscription(s) may include access to various Valve tools that can be used to create content ("Developer Tools"). Some examples include: the Valve software development kit (the "SDK") for a version of the computer game engine known as "Source" (the "Source Engine") and the associated Valve Hammer editor, The Source® Filmmaker Software, or in-game tools through which you can edit or create derivative works of a Valve game. Particular Developer Tools (for example, The Source® Filmmaker Software) may be distributed with separate Subscription Terms that are different from the rules set forth in this Section. Except as set forth in any separate Subscription Terms applicable to the use of a particular Developer Tool, you may use the Developer Tools, and you may use, reproduce,

publish, perform, display and distribute any content you create using the Developer Tools, however you wish, but solely on a non-commercial basis.

If you would like to use the Source Engine SDK or other Valve Developer Tools for commercial use, please contact Valve at sourceengine@valvesoftware.com.

D. License to Use Valve Game Content in Fan Art.

Valve appreciates the community of Subscribers that creates fan art, fan fiction, and audio-visual works that reference Valve games ("Fan Art"). You may incorporate content from Valve games into your Fan Art. Except as otherwise set forth in this Section or in any Subscription Terms, you may use, reproduce, publish, perform, display and distribute Fan Art that incorporates content from Valve games however you wish, but solely on a non-commercial basis.

If you incorporate any third-party content in any Fan Art, you must be sure to obtain all necessary rights from the owner of that content.

Commercial use of some Valve game content is permitted via features such as Steam Workshop or a Steam Subscription Marketplace. Terms applicable to that use are set forth in Sections 3.D. and 6.B. below and in any Subscription Terms provided for those features.

To view the Valve video policy containing additional terms covering the use of audio-visual works incorporating Valve intellectual property or created with The Source® Filmmaker Software, please click here: http://www.valvesoftware.com/videopolicy.html

E. License to Use Valve Dedicated Server Software

Your Subscription(s) may contain access to the Valve Dedicated Server Software. If so, you may use the Valve Dedicated Server Software on an unlimited number of computers for the purpose of hosting online multiplayer games of Valve products. If you wish to operate the Valve Dedicated Server Software, you will be solely responsible for procuring any Internet access, bandwidth, or hardware for such activities and will bear all costs associated with your use.

F. Ownership of Content and Services

All title, ownership rights and intellectual property rights in and to the Content and Services and any and all copies thereof, are owned by Valve and/or its or its affiliates' licensors. All rights are reserved, except as expressly stated herein. The Content and Services are protected by copyright laws, international copyright treaties and conventions and other laws. The Content and Services contain certain licensed materials and Valve's and its affiliates' licensors may protect their rights in the event of any violation of this Agreement.

G. Restrictions on Use of Content and Services

You may not use the Content and Services for any purpose other than the permitted access to Steam and your Subscriptions, and to make personal, non-commercial use of your Subscriptions, except as otherwise permitted by this Agreement or applicable Subscription Terms. Except as otherwise permitted under this Agreement (including any Subscription Terms or Rules of Use), or under applicable law notwithstanding these restrictions, you may not, in whole or in part, copy, photocopy, reproduce, publish, distribute, translate, reverse engineer, derive source code from, modify, disassemble, decompile, create derivative works based on, or remove any proprietary notices or labels from the Content and Services or any software accessed via Steam without the prior consent, in writing, of Valve.

You are entitled to use the Content and Services for your own personal use, but you are not entitled to: (i) sell, grant a security interest in or transfer reproductions of the Content and Services to other parties in any way, nor to rent, lease or license the Content and Services to others without the prior written consent of Valve, except to the extent expressly permitted elsewhere in this Agreement (including any Subscription Terms or Rules of Use); (ii) host or provide matchmaking services for the Content and Services or emulate or redirect the communication protocols used by Valve in any network feature of the Content and Services, through protocol emulation, tunneling, modifying or adding components to the Content and Services, use of a utility program or any other techniques now known or hereafter developed, for any purpose including, but not limited to network play over the Internet, network play utilizing commercial or non-commercial gaming networks or as part of content aggregation networks, websites or services, without the prior written consent of Valve; or (iii) exploit the Content and Services or any of its parts for any commercial purpose, except as expressly permitted elsewhere in this Agreement (including any Subscription Terms or Rules of Use).

3. BILLING, PAYMENT AND OTHER SUBSCRIPTIONS ▲

All charges incurred on Steam, and all purchases made with the Steam Wallet, are payable in advance and final, except as described in Sections 3.I and 7 below.

A. Payment Authorization

When you provide payment information to Valve or to one of its payment processors, you represent to Valve that you are the authorized user of the card, PIN, key or account associated with that payment, and you authorize Valve to charge your credit card or to process your payment with the chosen third-party payment processor for any Subscription, Steam Wallet funds, Hardware or other fees incurred by you.

For Subscriptions ordered based on an agreed usage period, where recurring payments are made in exchange for continued use ("Recurring Payment Subscriptions"), by continuing to use the Recurring Payment Subscription you agree and reaffirm that Valve is authorized to charge your credit card (or your Steam Wallet, if funded), or to process your payment with any other applicable third-party payment processor, for any applicable recurring payment amounts. If you have ordered any Recurring Payment Subscriptions, you agree to notify Valve promptly of any changes to your credit card account number, its expiration date and/or your billing address, or your PayPal or other payment account number, and you agree to notify Valve promptly if your credit card or PayPal or other payment account expires or is cancelled for any reason.

If your use of Steam or your purchase of Hardware on Steam is subject to any type of use or sales tax, then Valve may also charge you for those taxes, in addition to the Subscription or other fees published in the Rules of Use. All fees on Steam in the European Union and the United Kingdom include the EU or UK VAT ("VAT") tax. VAT amounts collected by Valve reflect VAT due on the value of any Content and Services, Hardware or Subscription.

You agree that you will not use IP proxying or other methods to disguise the place of your residence, whether to circumvent geographical restrictions on game content, to order or purchase at pricing not applicable to your geography, or for any other purpose. If you do this, Valve may terminate your access to your Account.

B. Responsibility for Charges Associated With Your Account

As the Account holder, you are responsible for all charges incurred, including applicable taxes, and all orders or purchases made by you or anyone that uses your Account, including your family or friends. If you cancel your Account, Valve reserves the right to collect fees, surcharges or costs incurred before cancellation. Any delinquent or unpaid Accounts must be settled before Valve will allow you to register again.

### C. Steam Wallet

Steam may make available an account balance associated with your Account (the "Steam Wallet"). The Steam Wallet is neither a bank account nor any kind of payment instrument. It functions as a prepaid balance to order Content and Services. You may place funds in your Steam Wallet up to a maximum amount determined by Valve, by credit card, prepaid card, promotional code, or any other payment method accepted by Steam. Within any twenty-four (24) hour period, the total amount stored in your Steam Wallet plus the total amount spent out of your Steam Wallet, in the aggregate, may not exceed US$2,000 or its equivalent in your applicable local currency — attempted deposits into your Steam Wallet that exceed this threshold may not be credited to your Steam Wallet until your activity falls below this threshold. Valve may change or impose different Steam Wallet balance and usage limits from time to time.

You will be notified by e-mail of any change to the Steam Wallet balance and usage limits within sixty (60) calendar days before the entry into force of the change. Your continued use of your Steam Account more than thirty (30) calendar days after the entry into force of the changes will constitute your acceptance of the changes. If you don't agree to the changes, your only remedy is to terminate your Steam Account or to cease use of your Steam Wallet. Valve shall not have any obligation to refund any credits remaining on your Steam Wallet in this case.

You may use Steam Wallet funds to order Subscriptions, including by making in-game orders where Steam Wallet transactions are enabled, and purchase Hardware. Subject to Section 3.I, funds added to the Steam Wallet are non-refundable and non-transferable. Steam Wallet funds do not constitute a personal property right, have no value outside Steam and can only be used to order Subscriptions and related content via Steam (including but not limited to games and other applications offered through the Steam Store, or in a Steam Subscription Marketplace) and Hardware. Steam Wallet funds have no cash value and are not exchangeable for cash. Steam Wallet funds that are deemed unclaimed property may be turned over to the applicable authority.

### D. Trading and Transactions of Subscriptions Between Subscribers

Steam may include one or more features or sites that allow Subscribers to trade, offer or order certain types of Subscriptions (for example, license rights to virtual items) with, to or from other Subscribers ("Subscription Marketplaces"). An example of a Subscription Marketplace is the Steam Community Market. By using or participating in Subscription Marketplaces, you authorize Valve, on its own behalf or as an agent or licensee of any third-party creator or publisher of the applicable Subscriptions in your Account, to transfer those Subscriptions from your Account in order to give effect to any trade or sale you make.

Valve may charge a fee for trades or sales in a Subscription Marketplace. Any fees will be disclosed to you prior to the completion of the trade or sale.

If you complete a trade, sale or order in a Subscription Marketplace, you acknowledge and agree that you are responsible for taxes, if any, which may be due with respect to your transactions, including sales or use taxes, and for compliance with applicable tax laws. Proceeds from sales you make in a Subscription Marketplace may be considered income to you for income tax purposes. You should consult with a tax specialist to determine your tax liability in connection with your activities in any Subscription Marketplace.

You understand and acknowledge that Valve does not have any obligation to provide or maintain any Subscription Marketplace. Valve may decide to cease operation of any Subscription Marketplace, change the fees that it charges or change the terms or features of the Steam Subscription Marketplace. You will be notified of any substantial change to the terms or availability of the Subscription Marketplace in a timely fashion before the entry into force of the change, except in cases of force majeure, Subscriber's fault or third party event outside of Valve's control.

You also understand and acknowledge that Subscriptions traded, sold or ordered in any Subscription Marketplace are license rights, that you have no ownership interest in such Subscriptions, and that Valve does not recognize any transfers of Subscriptions (including transfers by operation of law) that are made outside of Steam.

### E. Retail Purchase

Valve may offer or require a Subscription for purchasers of retail packaged product versions or OEM versions of Valve products. The "CD-Key" or "Product Key" accompanying such versions is used to activate your Subscription. Further instructions will be provided along with the respective product.

### F. Steam Authorized Resellers

You may order a Subscription through an authorized reseller of Valve. The "Product Key" accompanying such order will be used to activate your Subscription. Further instructions will be provided along with the respective product. If you order a Subscription from an authorized reseller of Valve, you agree to direct all questions regarding the Product Key to that reseller.

### G. Free Subscriptions

In some cases, Valve may offer a free Subscription to certain Content and Services. As with all Subscriptions, you are always responsible for any Internet service provider, telephone, and other connection fees that you may incur when using Steam, even when Valve offers a free Subscription.

### H. Third-Party Sites

Steam may provide links to other third-party sites. Some of these sites may charge separate fees, which are not included in and are in addition to any Subscription or other fees that you may pay to Valve. Steam may also provide access to third-party vendors, who provide content, goods and/or services on Steam or the Internet. Any separate charges or obligations you incur in your dealings with these third parties are your responsibility. Valve makes no representations or warranties, either express or implied, regarding any third party site. In particular, Valve makes no representation or warranty that any service or subscription offered via third-party vendors will not change or be suspended or terminated.

### I. Refunds and Right of Withdrawal

Without prejudice to any statutory rights you may have, you can request a refund for your orders or purchases on Steam in accordance with the terms of Valve's Refund Policy http://store.steampowered.com/steam_refunds/.

For European Union and United Kingdom consumers:

EU and UK law provides a statutory right to withdraw from certain contracts for physical merchandise and for the order of digital content. You can find more information about the extent of your statutory right to withdraw and the ways you can exercise it on this page: https://support.steampowered.com/kb_article.php?ref=8620-QYAL-4516.

### 4. ONLINE CONDUCT, CHEATING AND PROCESS TAMPERING ▲

Steam Subscriber Agreement

Your online conduct and interaction with other Subscribers must comply with the Steam Online Conduct Rules, to be found at http://steampowered.com/index.php?area=online_conduct. Depending on terms of use imposed by third parties who host particular games or other services, additional requirements may also be provided in the Subscription Terms applicable to a particular Subscription.

Steam and the Content and Services may include functionality designed to identify software or hardware processes or functionality that may give a player an unfair competitive advantage when playing multiplayer versions of any Content and Services or modifications of Content and Services ("Cheats"). You agree that you will not create Cheats or assist third parties in any way to create or use Cheats. You agree that you will not directly or indirectly disable, circumvent, or otherwise interfere with the operation of software designed to prevent or report the use of Cheats.

You agree that you will not tamper with the execution of Steam or Content and Services unless otherwise authorized by Valve. You acknowledge and agree that either Valve or any host of an online multiplayer game distributed through Steam ("External Host") may refuse to allow you to participate in certain online multiplayer games if you use Cheats or tamper with the execution of Steam or the Content and Services.

Further, you acknowledge and agree that External Hosts may report your use of Cheats or unauthorized process tampering to Valve, and Valve may communicate your history of use thereof to External Hosts within the boundaries of the Steam Privacy Policy.

Valve may restrict or terminate your Account or a particular Subscription for any conduct or activity that is illegal, constitutes a Cheat, or breaches the Steam Online Conduct Rules. You acknowledge that Valve is not required to provide you notice before terminating your Subscription(s) and/or Account.

You may not use Cheats, automation software (bots), mods, hacks, or any other unauthorized third-party software, to modify or automate any Subscription Marketplace process, the process of Steam account creation or otherwise in interacting with or controlling the processes or user interface of Steam, except to the degree expressly permitted.

5. THIRD-PARTY CONTENT ▲

In regard to all Subscriptions, Content and Services that are not authored by Valve, Valve does not screen such third-party content available on Steam or through other sources. Valve assumes no responsibility or liability for such third party content, unless to the extent provided by mandatory law. Some third-party application software is capable of being used by businesses for business purposes – however, you may only acquire such software via Steam for private personal use.

6. USER GENERATED CONTENT ▲

A. General Provisions

Steam provides interfaces and tools for you to be able to generate content and make it available to other users and/or to Valve at your sole discretion. "User Generated Content" means any content you make available to other users through your use of multi-user features of Steam, or to Valve or its affiliates through your use of the Content and Services or otherwise.

When you upload your content to Steam to make it available to other users and/or to Valve, you grant Valve and its affiliates the worldwide, non-exclusive right to use, reproduce, modify, create derivative works from, distribute, transmit, transcode, translate, broadcast, and otherwise communicate, and publicly display and publicly perform, your User Generated Content, and derivative works of your User Generated Content, for the purpose of the operation, distribution, incorporation as part of and promotion of the Steam service, Steam games or other Steam offerings, including Subscriptions. This license is granted to Valve as the content is uploaded on Steam for the entire duration of the intellectual property rights. It may be terminated if Valve is in breach of the license and has not cured such breach within fourteen (14) days from receiving notice from you sent to the attention of the Valve Legal Department at the applicable Valve address noted on this Privacy Policy page. The termination of said license does not affect the rights of any sub-licensees pursuant to any sub-license granted by Valve prior to termination of the license. Valve is the sole owner of the derivative works created by Valve from your User Generated Content, and is therefore entitled to grant licenses on these derivative works. If you use Valve cloud storage, you grant us a license to store your information as part of that service. Valve may place limits on the amount of storage you may use.

If you provide Valve with any feedback or suggestions about Steam, the Content and Services, or any Valve products, Hardware or services, Valve is free to use the feedback or suggestions however it chooses, without any obligation to account to you.

You agree that the User Generated Content you upload on Steam through the interfaces and tools provided by Valve is given significant exposure and that you share it for your enjoyment and for the recognition you may receive from other Subscribers. Consequently, you grant this license to Valve and its affiliates for free, notwithstanding any other contrary terms provided in App-Specific Terms, as defined under Section 6.B below.

B. Content Uploaded to the Steam Workshop

Some games or applications available on Steam ("Workshop-Enabled Apps") allow you to create User Generated Content based on or using the Workshop-Enabled App, and to submit that User Generated Content (a "Workshop Contribution") to one or more Steam Workshop web pages. Workshop Contributions can be viewed by the Steam community, and for some categories of Workshop Contributions users may be able to interact with, download or purchase the Workshop Contribution. In some cases, Workshop Contributions may be considered for incorporation by Valve or a third-party developer into a game or into a Subscription Marketplace.

You understand and agree that Valve is not obligated to use, distribute, or continue to distribute copies of any Workshop Contribution and reserves the right, but not the obligation, to restrict or remove Workshop Contributions for any reason.

Specific Workshop-Enabled Apps or Workshop web pages may contain special terms ("App-Specific Terms") that supplement or change the terms set out in this Section to reflect the individual requirements of the Workshop-Enabled App in question.

Under Section 6.A, Workshop Contributions are in principle made available to Subscribers for free. By way of exception, they may be made available to Subscribers for a fee. In that case, the way the revenues generated may be shared, and in particular, the compensation you may receive as a result of this making available, are defined in the App-Specific Terms and not by this Agreement. Unless otherwise specified in App-Specific Terms (if any), the following general rules apply to Workshop Contributions.

- Workshop Contributions are Subscriptions, and therefore you agree that any Subscriber receiving distribution of your Workshop Contribution will have the same rights to use your Workshop Contribution (and will be subject to the same restrictions) as are set out in this Agreement for any other Subscriptions.

- Notwithstanding the license described in Section 6.A, Valve will only have the right to modify including to create derivative works from your Workshop Contribution in the following cases: (a) Valve may make modifications necessary to make your Contribution compatible with Steam and the Workshop functionality or user interface, and (b) Valve or the applicable developer may make modifications to Workshop Contributions that are accepted for in-Application distribution as it deems necessary or desirable to

enhance gameplay or make it compatible with the Workshop-Enabled App. Under Section 6.A, you grant for free to Valve and its affiliates the right to modify, including to create derivative works from, your Workshop Contribution. As a result, you are not entitled to any compensation from Valve as a result of Valve's modifications.

- You may, in your sole discretion, choose to remove a Workshop Contribution from the applicable Workshop pages. If you do so, Valve will no longer have the right to use, distribute, transmit, communicate, publicly display or publicly perform the Workshop Contribution, except that (a) Valve may continue to exercise these rights for any Workshop Contribution that is accepted for distribution in-game or distributed in a manner that allows it to be used in-game, and (b) your removal will not affect the rights of any Subscriber who has already obtained access to a copy of the Workshop Contribution.

C. Promotions and Endorsements

If you use Steam services (e.g. the Steam Curators' Lists or the Steam Broadcasting service) to promote or endorse a product, service or event in return for any kind of consideration from a third party (including non-monetary rewards such as free games), you must clearly indicate the source of such consideration to your audience.

D. Representations and Warranties

You represent and warrant to us that you have sufficient rights in all User Generated Content to grant Valve and other affected parties the licenses described under A. and B. above or in any license terms specific to the applicable Workshop-Enabled App or Workshop page. This includes, without limitation, any kind of intellectual property rights or other proprietary or personal rights affected by or included in the User Generated Content. In particular, with respect to Workshop Contributions, you represent and warrant that the Workshop Contribution was originally created by you (or, with respect to a Workshop Contribution to which others contributed besides you, by you and the other contributors, and in such case that you have the right to submit such Workshop Contribution on behalf of those other contributors).

You furthermore represent and warrant that the User Generated Content, your submission of that Content, and your granting of rights in that Content does not violate any applicable contract, law or regulation.

7. DISCLAIMERS; LIMITATION OF LIABILITY; NO GUARANTEES; LIMITED WARRANTY & AGREEMENT ▲

THIS SECTION 7 DOES NOT APPLY TO EU OR UK SUBSCRIBERS.

- FOR AUSTRALIAN SUBSCRIBERS, THIS SECTION 7 DOES NOT EXCLUDE, RESTRICT OR MODIFY THE APPLICATION OF ANY GUARANTEE, RIGHT OR REMEDY THAT CANNOT BE SO EXCLUDED, RESTRICTED OR MODIFIED, INCLUDING THOSE CONFERRED BY THE AUSTRALIAN CONSUMER LAW (ACL). UNDER THE ACL, GOODS COME WITH GUARANTEES INCLUDING A GUARANTEE THAT GOODS ARE OF ACCEPTABLE QUALITY. IF THERE IS A FAILURE OF THIS GUARANTEE, YOU ARE ENTITLED TO A REMEDY (WHICH MAY INCLUDE HAVING THE GOODS REPAIRED OR REPLACED OR A REFUND). IF A REPAIR OR REPLACEMENT CANNOT BE PROVIDED OR THERE IS A MAJOR FAILURE, YOU ARE ENTITLED TO A REFUND.
- FOR NEW ZEALAND SUBSCRIBERS, THIS SECTION 7 DOES NOT EXCLUDE, RESTRICT OR MODIFY THE APPLICATION OF ANY RIGHT OR REMEDY THAT CANNOT BE SO EXCLUDED, RESTRICTED OR MODIFIED INCLUDING THOSE CONFERRED BY THE NEW ZEALAND CONSUMER GUARANTEES ACT 1993. UNDER THIS ACT ARE GUARANTEES WHICH INCLUDE THAT GOODS AND SERVICES ARE OF ACCEPTABLE QUALITY. IF THIS GUARANTEE IS NOT MET THERE ARE ENTITLEMENTS TO HAVE THE SOFTWARE REMEDIED (WHICH MAY INCLUDE REPAIR, REPLACEMENT OR REFUND). IF A REMEDY CANNOT BE PROVIDED OR THE FAILURE IS OF A SUBSTANTIAL CHARACTER, THE ACT PROVIDES FOR A REFUND.

Prior to acquiring a Subscription, you should consult the product information made available on Steam, including Subscription description, minimum technical requirements, and user reviews.

A. DISCLAIMERS

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, VALVE AND ITS AFFILIATES AND SERVICE PROVIDERS EXPRESSLY DISCLAIM (I) ANY WARRANTY FOR STEAM, THE CONTENT AND SERVICES, AND THE SUBSCRIPTIONS, AND (II) ANY COMMON LAW DUTIES WITH REGARD TO STEAM, THE CONTENT AND SERVICES, AND THE SUBSCRIPTIONS, INCLUDING DUTIES OF LACK OF NEGLIGENCE AND LACK OF WORKMANLIKE EFFORT. STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, AND ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS, "WITH ALL FAULTS" AND WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NONINFRINGEMENT. ANY WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312 OF THE UNITED STATES UNIFORM COMMERCIAL CODE AND/OR IN ANY OTHER COMPARABLE STATE STATUTE IS EXPRESSLY DISCLAIMED. ALSO, THERE IS NO WARRANTY OF TITLE, NON-INTERFERENCE WITH YOUR ENJOYMENT, OR AUTHORITY IN CONNECTION WITH STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, OR INFORMATION AVAILABLE IN CONNECTION THEREWITH.

ANY WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312 OF THE UNITED STATES UNIFORM COMMERCIAL CODE IS EXPRESSLY DISCLAIMED.

B. LIMITATION OF LIABILITY

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER VALVE, ITS LICENSORS, NOR THEIR AFFILIATES, NOR ANY OF VALVE'S SERVICE PROVIDERS, SHALL BE LIABLE IN ANY WAY FOR LOSS OR DAMAGE OF ANY KIND RESULTING FROM THE USE OR INABILITY TO USE STEAM, YOUR ACCOUNT, YOUR SUBSCRIPTIONS AND THE CONTENT AND SERVICES INCLUDING, BUT NOT LIMITED TO, LOSS OF GOODWILL, WORK STOPPAGE, COMPUTER FAILURE OR MALFUNCTION, OR ANY AND ALL OTHER COMMERCIAL DAMAGES OR LOSSES. IN NO EVENT WILL VALVE BE LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES, OR ANY OTHER DAMAGES ARISING OUT OF OR IN ANY WAY CONNECTED WITH STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, AND ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH, OR THE DELAY OR INABILITY TO USE THE CONTENT AND SERVICES, SUBSCRIPTIONS OR ANY INFORMATION, EVEN IN THE EVENT OF VALVE'S OR ITS AFFILIATES' FAULT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR BREACH OF VALVE'S WARRANTY AND EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THESE LIMITATIONS AND LIABILITY EXCLUSIONS APPLY EVEN IF ANY REMEDY FAILS TO PROVIDE ADEQUATE RECOMPENSE.

BECAUSE SOME STATES OR JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR THE LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, IN SUCH STATES OR JURISDICTIONS, EACH OF VALVE, ITS LICENSORS, AND ITS AFFILIATES' LIABILITY SHALL BE LIMITED TO THE FULL EXTENT PERMITTED BY LAW.

## C. NO GUARANTEES

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER VALVE NOR ITS AFFILIATES GUARANTEE CONTINUOUS, ERROR-FREE, VIRUS-FREE OR SECURE OPERATION AND ACCESS TO STEAM, THE CONTENT AND SERVICES, YOUR ACCOUNT AND/OR YOUR SUBSCRIPTION(S) OR ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH.

## D. LIMITED WARRANTY & AGREEMENT

CERTAIN HARDWARE PURCHASED FROM VALVE IS SUBJECT TO A LIMITED WARRANTY & AGREEMENT, [OR DEPENDING ON YOUR LOCATION, A STATUTORY WARRANTY] WHICH IS DESCRIBED IN DETAIL HERE.

## 8. AMENDMENTS TO THIS AGREEMENT ▲

PLEASE NOTE: If you are a consumer with place of residence in Germany, a different version of Section 8 applies to you, which is available here.

### A. Mutual Amendment

This Agreement may at any time be mutually amended by your explicit consent to changes proposed by Valve.

### B. Unilateral Amendment

Furthermore, Valve may amend this Agreement (including any Subscription Terms or Rules of Use) unilaterally at any time in its sole discretion. In this case, you will be notified by e-mail of any amendment to this Agreement made by Valve at least 30 (30) days before the effective date of the amendment. You can view the Agreement at any time at http://www.steampowered.com/. Your failure to cancel your Account prior to the effective date of the amendment will constitute your acceptance of the amended terms. If you don't agree to the amendments or to any of the terms in this Agreement, your only remedy is to cancel your Account or to cease use of the affected Subscription(s). Valve shall not have any obligation to refund any fees that may have accrued to your Account before cancellation of your Account or cessation of use of any Subscription, nor shall Valve have any obligation to prorate any fees in such circumstances.

## 9. TERM AND TERMINATION ▲

### A. Term

The term of this Agreement (the "Term") commences on the date you first indicate your acceptance of these terms, and will continue in effect until otherwise terminated in accordance with this Agreement.

### B. Termination by You

You may cancel your Account at any time. You may cease use of a Subscription at any time or, if you choose, you may request that Valve terminate your access to a Subscription. However, Subscriptions are not transferable, and even if your access to a Subscription for a particular game or application is terminated, the original activation key will not be able to be registered to any other account, even if the Subscription was obtained in a retail store. Access to Subscriptions ordered as a part of a pack or bundle cannot be terminated individually, termination of access to one game within the bundle will result in termination of access to all games ordered in the pack. Your cancellation of an Account, or your cessation of use of any Subscription or request that access to a Subscription be terminated, will not entitle you to any refund, including of any Subscription fees. Valve reserves the right to collect fees, surcharges or costs incurred prior to the cancellation of your Account or termination of your access to a particular Subscription. In addition, you are responsible for any charges incurred to third-party vendors or content providers before your cancellation.

### C. Termination by Valve

Valve may restrict or cancel your Account or any particular Subscription(s) at any time in the event that (a) Valve ceases providing such Subscriptions to similarly situated Subscribers generally, or (b) you breach any terms of this Agreement (including any Subscription Terms or Rules of Use). In the event that your Account or a particular Subscription is restricted or terminated or cancelled by Valve for a violation of this Agreement or improper or illegal activity, no refund, including of any Subscription fees or of any unused funds in your Steam Wallet, will be granted.

### D. Survival of Terms

Sections 2.C., 2.D., 2.F., 2.G., 3.A., 3.B., 3.D., 3.H., and 5 – 11 will survive any expiration or termination of this Agreement.

## 10. APPLICABLE LAW/JURISDICTION ▲

Most user concerns can be resolved by use of our Steam support site at https://support.steampowered.com/. If Valve is unable to resolve your concerns and a dispute remains between you and Valve, this Section explains how the parties have agreed to resolve it.

For All Subscribers Outside the European Union and United Kingdom:

You and Valve agree that this Agreement shall be deemed to have been made and executed in the State of Washington, U.S.A., and Washington law, excluding conflict of laws principles and the Convention on Contracts for the International Sale of Goods, governs all disputes and claims arising out of or relating to: (i) any aspect of the relationship between us; (ii) this Agreement; or (iii) your use of Steam, your Account or the Content and Services. You and Valve agree that all disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction. You and Valve hereby consent to the exclusive jurisdiction of such courts and waive any objections as to personal jurisdiction or venue in such courts.

If the laws where you live mandate alternative dispute resolution options, you may seek a remedy under those options. If you are a consumer who lives in Russia, you may also seek a remedy with local Russian state courts.

For EU and UK Subscribers:

This Agreement is governed by the law of the country where you have your habitual residence.

In the event of a dispute relating to the interpretation, the performance or the validity of the Subscriber Agreement, an amicable solution may be sought before any legal action. You can file your complaint at http://help.steampowered.com. The European Commission provides an Online Dispute Resolution website for EU consumers at https://ec.europa.eu/consumers/odr. Participation in this website is not available to US companies, which is why Valve is not registered there. However, insofar as your complaint concerns the behavior of Valve's data protection representative Valve GmbH you can file your complaint there.

In the event that an Alternative Dispute Resolution Procedure fails, or if either Valve or you prefer not to resort to Alternative Dispute Resolution, you may bring proceedings in the courts of the place where you are domiciled.

## 11. MISCELLANEOUS ▲

In the event that any provision of this Agreement is held by a court to be invalid or unenforceable, such provision will be deemed severable and the remaining provisions of this Agreement shall remain in full force and effect.

This Agreement, including any Subscription Terms, Rules of Use, the Valve Privacy Policy, and the Valve Hardware Limited Warranty Policy, constitutes and contains the entire agreement between the parties with respect to the subject matter hereof and supersedes any prior oral or written agreements. You agree that this Agreement is not intended to confer and does not confer any rights or remedies upon any person other than the parties to this Agreement.

Valve's obligations are subject to existing laws and legal process and Valve may comply with law enforcement or regulatory requests or requirements notwithstanding any contrary term.

You agree to comply with all applicable import/export laws and regulations. You agree not to export the Content and Services or Hardware or allow use of your Account by individuals of any terrorist supporting countries to which encryption exports are at the time of exportation restricted by the U.S. Bureau of Export Administration. You represent and warrant that you are not located in, under the control of, or a national or resident of any such prohibited country.

This Agreement was last updated on September 26, 2024 ("Revision Date"). If you were a Subscriber before the Revision Date, it replaces and supersedes your existing agreement with Valve or Valve SARL on the day that it becomes effective according to Section 8 above.

Privacy Feedback

 © 2024 Valve Corporation. All rights reserved. All trademarks are property of their respective owners in the US and other countries. VAT included in all prices where applicable.   Privacy Policy  |  Legal  |  Steam Subscriber Agreement  |  Refunds  |  Cookies

About Valve    |    Jobs    |    Steamworks    |    Steam Distribution    |    Support    |    Recycling    |    Gift Cards    |    🅕 Steam    |    𝕏 @steam

# EXHIBIT 2

AMERICAN ARBITRATION ASSOCIATION

|  |  |
|---|---|
| Individual Claimants,<br><br>     Claimants,<br><br>  v.<br><br>Valve Corporation,<br><br>     Respondent. | Case No. 01-23-0005-8578 |

ORDER OF PROCESS ARBITRATOR

The arbitrations that are subject to this Order were commenced by Claimants in April 2024. The Process Arbitrator has been appointed by the parties pursuant to Respondent's Steam Subscriber Agreements that the parties entered into and the Mass Arbitration Supplementary Rules of the American Arbitration Association ("AAA"). Having been duly sworn; and having duly heard the proofs and allegations of Claimants, represented by Mason LLP and Siri & Glimstad LLP, and Respondent, represented by Skadden, Arps, Slate, Meagher & Flom LLP; do hereby Order as follows:

1

Procedural Background

Claimants' counsel made four mass AAA arbitration filings against Respondent, totaling 19,911 claimants – three in December 2023 and one in April 2024.

The Process Arbitrator was appointed by the AAA on or about October 23, 2025. The appointment is solely with respect to the fourth mass arbitration filing in April 2024 on behalf of 5,000 Claimants (the "April 2024 Arbitrations"). The Process Arbitrator has been asked to rule on the following administrative issues:

1.  Respondent has asked the Process Arbitrator to determine whether the April 2024 Arbitrations should be closed or stayed pending a determination by a court regarding which of two separate Steam Subscriber Agreements applies to the April 2024 Arbitrations.

2.  Claimants have asked the Process Arbitrator to determine whether the AAA 2023 Mass Arbitration Supplementary Rules ("2023 MA Rules") or AAA 2024 Mass Arbitration Supplementary Rules ("2024 MA Rules") apply to the April 2024 Arbitrations.

The Emergency Arbitrator conducted a preliminary video conference with counsel for the parties on November 11, 2025, during which a briefing schedule was agreed upon. Thereafter, Claimants filed with the AAA Claimants' Brief on the Applicable AAA Mass Arbitration Supplementary Rules, dated December 12, 2025; Claimants' Opposition to Respondent Valve Corporation's Request to Close or Stay the Arbitrations, dated January 9, 2026; and Claimants' Reply Brief on the Applicable AAA Mass Arbitration Supplementary Rules, dated January 26, 2026.

2

Respondent filed with the AAA Respondent Valve Corporation's Memorandum of Law in support of its Request that the Arbitrations be Closed or Stayed, dated December 12, 2025; Respondent Valve Corporation's Response to Claimants' Brief on the applicable AAA Mass Arbitration Supplementary Rules, dated  January 9, 2024; and Respondent Valve Corporation's Reply Memorandum of Law in further support of its Request that the Arbitrations be Closed or Stayed, dated January 26, 2026.

Factual Summary

### The Parties

Respondent Valve Corporation is, among other things, a developer and owner of Steam, a digital video game distribution platform. In 2003, Respondent launched Steam to distribute and update its own video games. By 2005, Respondent expanded Steam's capabilities to allow third parties to market and distribute their video games through Steam. Steam currently has tens of thousands of game developers and publishers using the platform to distribute more than 100,000 games and engage with millions of players worldwide. Gamers rely on Steam to purchase and play video games from Respondent and other publishers and to connect with fellow players and game developers. Claimants are 5,000 individuals who are Steam users.

### The Steam Subscriber Agreement

To become a Steam user, one must first create a Steam account and agree to Respondent's Steam Subscriber Agreement ("SSA"). Therefore, as Steam users, Claimants were required to agree to an SSA.

In arbitrations that preceded the filing of the April 2024 Arbitrations, in which claims were asserted that are the same or similar to the claims asserted in the April 2024 Arbitrations,

3

rulings were made by merits arbitrators that the agreement to arbitrate that was in the SSA and in effect in 2023 (the "2023 SSA") was unenforceable.

Thereafter, on or about September 26, 2024, Respondent amended the 2023 SSA (the "2024 SSA"). In the 2024 SSA, Valve removed the arbitration agreement and class action waiver. Instead, the 2024 SSA requires that all disputes arising out of the 2024 SSA be resolved exclusively in courts in King County, Washington State.

It is not contested that Respondent provided notice that the 2023 SSA was amended and replaced by the 2024 SSA -- in an email to Steam users, an in-app pop-up notification, and a notice on Respondent's website ("This updated Steam Subscriber Agreement will become effective immediately when you agree to it, including when you make more purchases, fund your Steam wallet, or otherwise accept it. Otherwise, the updated Steam Subscriber Agreement will become effective on November 1, 2024, unless you delete or discontinue use of your Steam account before then.") [Valve Ex. 13] Steam users accepted the 2024 SSA by checking a box labeled "I agree to the Updated Steam Subscriber Agreement" and clicking "Accept Updated SSA" when prompted, making purchases, or funding their Steam wallet.

Accordingly, Claimants have accepted the 2024 SSA either by affirmatively accepting the 2024 SSA or continuing to use their Steam accounts on or after November 1, 2024. Regarding any Claimant who has not logged on to Steam since November 1, 2024, Respondent has represented that it is prepared to continue with the April 2024 Arbitrations.

<u>Analysis and Discussion</u>

<u>Applicable Law and Rules</u>

Section 10 of the 2023 SSA and 2024 SSA provide that they shall be governed by the laws of the State of Washington.

4

Section 11 of the 2023 SSA provides, in relevant part: "YOU AND VALVE AGREE TO RESOLVE ALL DISPUTES AND CLAIMS BETWEEN US IN INDIVIDUAL BINDING ARBITRATION."

Section 8B of the 2023 SSA provides for its unilateral amendment:

Valve may amend this Agreement . . . unilaterally at any time in its sole discretion. In this case, you will be notified by e-mail of any amendment to this Agreement made by Valve at least 30 (30) before the effective date of the amendment. . .. Your failure to cancel your Account prior to the effective date of the amendment will constitute your acceptance of the amended terms. If you don't agree to the amendments or to any of the terms in this Agreement, your only remedy is to cancel your Account or to cease use of the affected Subscription(s).

Section 10 of the 2024 SSA provides, in relevant part: "You and Valve agree that all disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction." Section 11 of the 2024 SSA includes a merger clause, which states: "This Agreement . . . constitutes and contains the entire agreement between the parties with respect to the subject matter hereof and supersedes any prior oral or written agreements."

The 2023 MA Rules state, in relevant part: "Only administrative issues may be submitted to the Process Arbitrator for determination. Administrative issues include . . . iii. determining the applicable AAA rules that will govern the individual disputes . . . v. any other administrative issue arising out of the nature of the Mass Arbitration." 2023 MA Rules 6(d)(iii), (v).

The 2024 MA Rules state, in relevant part: "The Process Arbitrator shall have the authority to determine the following issues: . . . vi. Determining the applicable AAA-ICDR Rules that will govern the individual disputes; . . . ix. Whether subsequently filed cases are part of the

5

same mass arbitration. . . . xi. Any other non-merits issues affecting case administration arising out of the nature of the mass arbitration that the Process Arbitrator determines is appropriate for determination[.]" 2024 MA Rules 6(c)(vi), (ix), (xi).

Does the 2023 SSA or 2024 SSA apply to the April 2024 Arbitrations

On the issue of whether the 2023 SSA or 2024 SSA applies to the April 2024 Arbitrations, Claimants argue that the 2023 SSA applies and that the determination of such issue is for the arbitrator.

In contrast, Respondent argues that the issue of whether the 2023 SSA or 2024 SSA applies is for a court to decide, not an arbitrator. Respondent relies upon the United States Supreme Court case, *Coinbase, Inc. v. Suski*, 602 U.S. 143 (2024). The issue before the Court in *Coinbase* was "the question of who -- a judge or an arbitrator -- should decide whether a subsequent contract supersedes an earlier arbitration agreement that contains a delegation clause." *Coinbase*, 602 U.S. at 147.

The Court stated in *Coinbase* that, where there are two competing agreements, one with an arbitration clause and one without such clause, "a court must decide which contract governs. To hold otherwise would be to impermissibly "'elevate a [delegation provision] over other forms of contract.'"" 602 U.S. at 152 (citations omitted). Thus, the Court reached this conclusion even though the arbitration clause at issue contained a delegation clause broadly delegating questions of arbitrability to the arbitrator. The Court found that delegation cannot override a court's authority to determine which contract controls. The Court's rationale is rooted in the foundational principle that arbitration is a matter of contract and consent, and parties are bound to arbitrate only if they have agreed to do so. "[B]efore either the delegation provision or the

6

forum selection clause can be enforced, a court needs to decide what the parties have agreed to - i.e., which contract controls." 602 U.S. at 145.

In approximately two years since *Coinbase* was decided, lower federal courts have adopted its holding. In *Pilon v. Discovery Communications, LLC*, 769 F. Supp. 3d 273, 291 (S.D.N.Y. 2025), the court held that "where . . . parties have agreed to two contracts—one sending arbitrability disputes to arbitration, and the other either explicitly or implicitly sending arbitrability disputes to the courts—a court must decide which contract governs." (quoting *Coinbase*, 602 U.S. at 152); *Tachi-S Eng'g U.S.A., Inc. v. Canoo Techs. Inc.*, No. 24-1291, 2025 WL 253046, at *5 (6th Cir. Jan. 21, 2025) (applying *Coinbase* in affirming denial of motion to compel arbitration; removal of an arbitration provision in a subsequent contract applied retroactively to an action under the first contract); *Williams v. Experian Info. Sols. Inc.*, No. CV-23-01076-PHX-DWL, 2024 WL 3876171, at *16 (D. Ariz. Aug. 20, 2024) ("[T]he delegation clause in the April 2016 Arbitration Agreement does not preclude the Court from determining whether that version of the arbitration agreement was later superseded by the February 2023 Arbitration Agreement."). Respondent asserts that these decisions confirm that the court's authority to decide whether the parties agreed to arbitrate is not displaced by an arbitration or delegation clause in a prior agreement.

Claimants assert that, in contrast to *Coinbase*, where separate competing agreements were at issue, this case presents different versions of the same agreement. However, the Court in *Coinbase* held without qualification that "a court, not an arbitrator, must decide whether the parties' first agreement was superseded by their second." *Coinbase*, 602 U.S. at 152. A court "has the authority to enjoin arbitration proceedings where there is no valid, enforceable arbitration agreement between the parties." *Morgan Stanley & Co. v. Couch*, 134 F. Supp. 3d 1215, 1234

7

(E.D. Cal. 2015), *aff'd*, 659 F. App'x 402 (9th Cir. 2016). The fact that the parties dispute whether an amendment to an arbitration provision is applicable to claims does not affect the court's exclusive authority to determine which agreement controls. In *Pilon v. Discovery Communications, LLC*, the Court found that the relevant petitioner's assent to Discovery's updated terms by clicking through a pop-up and continuing to use the Discovery service "extinguishes any right he once had under the delegation clause" of the prior agreement, even though his claims had already accrued. 769 F. Supp. 3d at 292. That was so even though petitioner's claims had been noticed and already accrued prior to the amendment:

> Though the parties dispute whether a modification applicable to accrued contract claims is enforceable, that dispute does not extend to a subsequent forum-selection clause that supersedes a delegation clause. That is because the arbitrability decision is not a *claim* that *accrues*, but merely a forum-selection determination based on the scope of an agreement to arbitrate.

769 F. Supp. 3d 273 at 292 n.4.

Claimants argue that, if Respondent's approach is accepted, any company could compel arbitration, wait for claims to accrue, see how the arbitration proceeds, and then delete arbitration clauses in the operative agreement to escape liability and force a claimant to start over again in another forum. In this regard, Claimants argue that Respondent regards *Coinbase* as an open ticket to derail arbitrations at any stage, even after an arbitrator has rendered a decision on the merits, thereby making arbitration agreements illusory and upsetting mass arbitration administration nationwide. However, Claimants' argument does not account for the fact that Claimants (with limited exceptions) accepted the 2024 SSA through their acts described above.

The question of which agreement governs is not an administrative or case management issue, but rather a substantive, threshold question of contract law. *Bassidji v. Goe*, 413 F.3d 928, 936 (9th Cir. 2005) ("The question whether a particular agreement is enforceable is one of

8

substance, not procedure.").

The Process Arbitrator's role is expressly limited to resolving administrative, i.e., non-merits, issues enumerated in AAA MA Rule 6. In this matter, the AAA has confirmed that the Process Arbitrator's function is confined to addressing administrative issues. Accordingly, determining whether the 2023 SSA or 2024 SSA governs is a question outside the Process Arbitrator's authority under the 2023 MA Rules and 2024 MA Rules.

However, the Process Arbitrator does have authority under the AAA MA Rules to direct that the AAA stay the April 2024 Arbitrations until a court determines which SSA applies. In this case, the Process Arbitrator finds that a court must rule on whether the 2023 SSA or 2024 SSA governs the April 2024 Arbitrations and stays the April 2024 Arbitrations until such ruling is made.

<u>Which AAA Rules apply to the April 2024 Arbitrations</u>

In a letter, dated May 7, 2024, the AAA confirmed:

> Upon review of the documents submitted in the above-referenced matters, the AAA has determined that these disputes [the April 2024 Arbitrations] will be administered in accordance with the AAA's Mass Arbitration Supplementary Rules, as effective April 1, 2024, in conjunction with the Consume Arbitration Rules. The Consumer Mass Arbitration and Mediation Fee Schedule, as effective January 15, 2023, will also apply to these matters. We note that this is the result of AAA's initial review, and is subject to review by a Process Arbitrator.

Claimants request that the Process Arbitrator review this AAA determination.

Claimants assert that the April 2024 Arbitrations are part of the mass arbitration started in 2023, even though they were not filed simultaneously, because they involve the same claims against Respondent as the claims brought by the same counsel in 2023. Claimants point out that MA Rule 1(c) states: "These Supplementary Rules apply whenever 25 or more similar Demands for Arbitration are filed, whether or not such cases are filed simultaneously." Thus, Claimants

9

argue that any group of cases that satisfies the standard set by MA Rule 1(b) is a mass arbitration, even when cases are not all filed at the same time. Since the April 2024 Arbitrations are part of the same mass arbitration started in 2023, they should all be governed by the 2023 MA Rules.

In response, Respondent argues that the 2024 MA Rules apply to the April 2024 Arbitrations because: (1) the 2024 Rules were in effect when Claimants commenced the April 2024 Arbitrations; and (2) Claimants' Counsel confirmed the understanding that the 2024 MA Rules apply to the April 2024 Arbitrations by enclosing an attorney affirmation attesting to the truth and correctness of the information contained in each of the April 2024 Arbitrations, which the 2024 MA Rules require but the 2023 MA Rules do not. More specifically, Respondent points out that an amendment to the 2023 MA Rules was to add a requirement that every mass submission "must include an affirmation that the information provided for each individual case is true and correct to the best of the representative's knowledge." 2024 MA Rules, MA-2.

Neither the 2023 MA Rules nor the 2024 MA Rules require that all arbitrations submitted in a mass arbitration be subject to the same set of rules. Nor is there language in the 2023 MA Rules or 2024 MA Rules that provides for segregating a group of claims that meet the definition of mass arbitration under MA Rule 1(b).

The AAA has confirmed that the 2024 MA Rules were in effect at the time the April 2024 Arbitrations commenced and determined that the 2024 MA Rules apply to the April 2024 Arbitrations. The Process Arbitrator agrees with the determination of the AAA and determines that the 2024 MA Rules apply.

10

Conclusion

Based on the forgoing, the Process Arbitrator makes the following Order:

1.  The April 2024 Arbitrations are stayed pending resolution by a court of the issue of whether the 2023 SSA or 2024 SSA governs the April 2024 Arbitrations.

2.  The AAA 2024 Mass Arbitration Supplementary Rules apply to the April 2024 Arbitrations.

February 9, 2026

David C. Singer, Process Arbitrator

I, David C. Singer, do hereby affirm upon my oath as Process Arbitrator that I am the individual described in and who executed this instrument, which is the Order of Process Arbitrator.

February 9, 2026

David C. Singer, Process Arbitrator

11

# EXHIBIT 3

Doc #: 2023057583
07/10/2023 10:45 AM

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)

B. E-MAIL CONTACT AT SUBMITTER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

**COGENCY GLOBAL INC.**
**115 North Calhoun Street, Suite #4**
**Tallahassee, FL 32301**

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| MASON LLP | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 5335 WISCONSIN AVE., N.W., SUITE 640 | WASHINGTON | DC | 20015 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| BENCH WALK 22M, L.P. | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 123 JUSTISON ST., 7TH FLOOR | WILMINGTON | DE | 19801 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

COLLATERAL AS DEFINED IN THE AGREEMENT BETWEEN DEBTOR AND SECURED PARTY.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility    6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:
43915-137363; FILE IN WASHINGTON, D.C.

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)

# EXHIBIT 4

Doc #: 2025045885
05/09/2025 01:01 PM

# UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)

B. E-MAIL CONTACT AT SUBMITTER (optional)

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

COGENCY GLOBAL INC.
115 N. CALHOUN ST, STE 4
TALLAHASSEE, FL 32301

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
2023057583 FILED ON 7/10/2023

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Part(y)(ies) authorizing this Termination Statement

3. ☐ ASSIGNMENT:  Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9; check ASSIGN Collateral box in Item 8 and describe the affected collateral in item 8

4. ☐ CONTINUATION:  Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5.    PARTY INFORMATION CHANGE:

Check one of these two boxes:

This Change affects ☐ Debtor or ☐ Secured Party of record

AND  Check one of these three boxes to:

☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION:  Complete for Party Information Change - provide only one name (6a or 6b)

OR

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION:  Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

OR

7a. ORGANIZATION'S NAME

7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)    SUFFIX

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8.    COLLATERAL CHANGE:    Check only one box:    ☐ ADD collateral    ☐ DELETE collateral    ☑ RESTATE covered collateral    ☐ ASSIGN* collateral

Indicate collateral:    *Check ASSIGN COLLATERAL only if the assignee's power to amend the record is limited to certain collateral and describe the collateral in Section 8

## SEE EXHIBIT A ATTACHED HERETO AND INCORPORATED HEREIN.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:  Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

OR

9a. ORGANIZATION'S NAME
BENCH WALK 22M, L.P.

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

10. OPTIONAL FILER REFERENCE DATA:
FILE IN WASHINGTON DC - 43915-137363         Debtor: Mason LLP

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 07/01/23)

**EXHIBIT A**
**TO**
**UNIFORM COMMERCIAL CODE FINANCING STATEMENT**

**Debtor: Mason LLP**

**Secured Party: Bench Walk 22m, L.P.**

The Collateral includes any and all right, title or interest of Debtor in or to any and all of the following assets, rights and properties now owned or at any time hereafter acquired by Debtor or in which Debtor now has or at any time in the future may acquire any right, title or interest:

    (a)  the Proceeds;

    (b)  any funds in the Debtor's Segregated Account or the Deposit Account; and

    (c)  to the extent not otherwise included, all proceeds (as defined in the UCC) of any and all of the foregoing.

The capitalized terms in the foregoing description of the Collateral, and certain capitalized terms used in defining those capitalized terms, have the following meanings:

"Agreement" means that certain Litigation Funding Agreement, dated as of July 8, 2023, between Debtor and Secured Party, together with all schedules thereto, as amended from time to time in accordance with the terms thereof.

"Claims" means any and all claims asserted or to be asserted by Debtor on behalf of the Clients as more specifically described on Schedule 1 of the Agreement, whether such claims are asserted in mass arbitration, litigation or otherwise, including the same if transferred to any other jurisdictions or forums (arbitral, judicial or otherwise), together with (a) any and all claims, suits, causes of action, proceedings, and other rights relating to, or arising therefrom, (b) any and all appellate proceedings, proceedings on remand, and enforcement, ancillary, parallel or alternate dispute resolution proceedings and processes arising out of or related thereto, and (c) any additional cases, lawsuits, arbitration matters or other proceedings filed or initiated by or on behalf of the Clients or any of their affiliates based upon the same or substantially similar claims.

"Clients" means any persons represented by Debtor in the Claims.

"Debtor" means Mason LLP.

"Debtor's Segregated Account" means that certain deposit account described on Schedule 1 of the Agreement as the "Firm's Segregated Account."

"Deposit Account" means a deposit account, or similar account, held with a bank in the United States selected by Debtor and reasonably acceptable to Secured Party, into which the Deposit Account Administrator shall ensure that all Proceeds (including settlements and awards) are deposited and distributed in accordance with the terms and conditions set forth in the Agreement.

"Deposit Account Administrator" means a party selected by Debtor and reasonably acceptable to Secured Party to manage and control the Deposit Account in accordance with the terms and conditions of the Transaction Documents.

LP 24988684.2 \ 43915-137363

"Proceeds" means any receipt of money, financial gain or non-monetary value by Debtor or a related party in connection with the Claims. Proceeds will include, without limitation, any payments for legal fees or the reimbursement of costs and expenses, and any payments to Debtor under an insurance policy in connection with the Claims.

"Secured Party" means Bench Walk 22m, L.P.

"Transaction Documents" means the Agreement, the retainer or other fee agreements between Debtor and the Clients, the Co-Counsel Agreements, and any other ancillary or related document stipulated and agreed to by Secured Party and Debtor from time to time.

"UCC" means the Uniform Commercial Code as in effect on the date of the Agreement in the State of New York.

Any capitalized terms used herein and not otherwise defined shall have the meanings assigned thereto in the Agreement.

2

# EXHIBIT 5

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

206246

2023 APR -6 PM 4: 30

**A. NAME & PHONE OF CONTACT AT FILER [optional]**

**B. SEND ACKNOWLEDGMENT TO:**  (Name and Address)

DRAWDOWN - 26

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| BUCHER LAW PLLC | | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 350 NORTHERN BOULEVARD, SUITE 324-1519 | ALBANY | NY | 12204 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|---|
| | | PLLC | NEW YORK | ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| BENCH WALK 22M, L.P. | | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 123 JUSTISON STREET, 7TH FLOOR | WILMINGTON | DE | 19801 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

COLLATERAL AS DESCRIBED ON EXHIBIT A ATTACHED HERETO AND INCORPORATED HEREIN.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum [if applicable]     7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional]   ☐ All Debtors  ☐ Debtor 1  ☐ Debtor 2

**8. OPTIONAL FILER REFERENCE DATA**

NY SOS

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

**FILING NUMBER: 202304060119859**

EXHIBIT 6
TO

2023 APR -5 PM 1: 30

## UNIFORM COMMERCIAL CODE FINANCING STATEMENT

**Debtor: Bucher Law PLLC**
**Secured Party: Bench Walk 22m, L.P.**

The Collateral includes any and all right, title or interest of the Debtor in or to any and all of the following assets, rights and properties now owned or at any time hereafter acquired by the Debtor or in which the Debtor now has or at any time in the future may acquire any right, title or interest:

(a)     the Proceeds;

(b)     the Claims;

(c)     all documents of title, chattel paper and instruments pertaining to the Claims, and a true and correct copy of the Debtor's books, Records, files, correspondence, evidentiary materials and records pertaining to the Claims, all of which are stipulated as accurate by the Debtor;

(d)     rights under any appeal bond or similar instrument posted by any of the defendants in the Claims; and

(e)     to the extent not otherwise included, all proceeds (as defined in the UCC) of any and all of the foregoing.

The capitalized terms in the foregoing description of the Collateral, and capitalized terms used in defining those capitalized terms, have the following meanings:

*"Agreement"* means the Litigation Funding Agreement, dated as of April 5, 2023, by and between the Debtor and the Secured Party, together with all schedules and exhibits thereto, as amended from time to time in accordance with the terms thereof.

*"Claims"* means any and all claims asserted or to be asserted by the Debtor on behalf of the Clients against Valve Corporation, any of its respective affiliates or representatives, or any other party in connection with the Steam Subscriber Agreement, and any related antitrust violations alleged to have been committed by Valve Corporation, any of its respective affiliates or representatives, or any other party, whether such claims are asserted in mass arbitration, litigation or otherwise, including the same if transferred to any other jurisdictions or forums (arbitral, judicial or otherwise), together with (a) any and all claims, suits, causes of action, proceedings, and other rights relating to, or arising therefrom, (b) any and all appellate proceedings, proceedings on remand, and enforcement, ancillary, parallel or alternate dispute resolution proceedings and processes arising out of or related thereto, and (c) any additional cases, lawsuits, arbitration matters or other proceedings filed or initiated by or on behalf of the Clients or any of their affiliates based upon the same or substantially similar claims.

*"Clients"* means any persons represented by the Debtor in the Claims.

*"Debtor"* means Bucher Law PLLC.

LP 22335095.1 \ 43915-135894

206245

2023 APR -6 PM 4: 30

*"Proceeds"* means any receipt of money, financial gain or non-monetary value by the Debtor or a related party in connection with the Claims. Proceeds will include, without limitation, any payments for legal fees or the reimbursement of costs and expenses, and any payments to the Debtor under an insurance policy in connection with the Claims. Where Proceeds are in a form other than cash, (a) the Secured Party will determine, with reasonable consideration of input from the Debtor, the present value of the non-cash Proceeds in good faith for the purposes of calculating the Profit Share due to the Secured Party, and (b) the Debtor shall take all actions necessary to cause the monetization of all such non-cash Proceeds, to obtain the cash value of such non-cash Proceeds as soon as practicable, and to cause the payment of the cash Proceeds received in accordance with the Agreement.

*"Records"* shall have the meaning assigned to such term in the UCC.

*"Secured Party"* means Bench Walk 22m, L.P.

*"UCC"* means the Uniform Commercial Code as in effect on the date of the Agreement in the State of New York or, in relation to the perfection or priority of a security interest, the Uniform Commercial Code that then governs under the choice of law rules applicable to questions of perfection or priority.

Any capitalized terms used herein and not otherwise defined shall have the meanings assigned thereto in the Agreement.

LP 22335095.1 \ 43915-135894

# EXHIBIT 6

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

202999

2025 13 12

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

COGENCYGLOBAL - 26

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | | |
|---|---|---|---|---|---|---|
| Labaton Keller Sucharow LLP | | | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | | CITY | | STATE | POSTAL CODE | COUNTRY |
| 140 Broadway | | New York | | NY | 10005 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| Not Applicable | | LLP | New York | | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | | | |
|---|---|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | | CITY | | STATE | POSTAL CODE | COUNTRY |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| Not Applicable | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | | |
|---|---|---|---|---|---|---|
| Bench Walk 25e, L.P. | | | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | | CITY | | STATE | POSTAL CODE | COUNTRY |
| 6501 Park of Commerce Boulevard, Suite 237 | | Boca Raton | | FL | 33487 | USA |

4. This FINANCING STATEMENT covers the following collateral:

ALL ASSETS OF DEBTOR WHETHER NOW OWNED OR HEREAFTER ACQUIRED.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum    [if applicable]    7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional]    ☐ All Debtors    ☐ Debtor 1    ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

File with NY SOS - 43915-144779

FILING NUMBER: 202503130086196

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)